**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Elizabeth Ferris<br>4 Robin Ridge<br>New Milford, CT 06776<br><br>and<br><br>Hazie Crespo<br>1806 Branch Avenue, SE<br>Washington, DC 20020<br><br>and<br><br>Katherine Crowder<br>3921 Sunstream Pkwy<br>Virginia Beach, VA 23456<br><br>     Plaintiffs,<br>   v.<br><br>District of Columbia<br><br>Serve: Muriel Bowser<br>Mayor of the District of Columbia<br>1350 Pennsylvania Ave. NW<br>Washington, DC 20004<br><br>Serve: Brian Schwalb<br>Attorney General of the District of Columbia<br>400 6th St. NW<br>Washington, DC 20001<br><br>and<br><br>Officers John/Jane DOE 1 – DOE 20<br>in their individual and official capacities<br><br>     Defendants. | Case No. 1:23-cv-481<br><br><br><br>**JURY TRIAL DEMANDED** |

1

## COMPLAINT

### (Violation of First Amendment Rights, Fourth Amendment Rights, Negligence)

1.      In the aftermath of the murder of George Floyd by police, people across the United States flooded the streets united in progressive protests against racist police violence, demanding accountability and change. During these racial justice demonstrations in Washington, D.C., the D.C. Metropolitan Police Department ("MPD") engaged in repressive and violent tactics including the authorized indiscriminate use of "less lethal" projectile weapons against peaceful protestors and bystanders, gratuitously and without notice or warning and in order to intentionally retaliate against and inflict pain upon protestors challenging policing in our society.

2.      The MPD and its officers intentionally and repeatedly, over many months, opened fire on peaceful protestors with barrages of maiming munitions, deployed into crowds of people indiscriminately and causing injuries to persons engaging in constitutionally protected First Amendment activities.

3.      The Plaintiffs in this matter were each peacefully present at racial justice demonstrations and subject to police attack with less lethal weapons that inflicted injuries and extreme pain including wounds consistent with stinger grenades, foam or rubber bullets, and flash bang devices. Two plaintiffs were subject to munitions that exploded many pieces of shrapnel into their legs causing bloody shredding, punctures, lacerations and other mutilation.

4.      Time and again the MPD attacked peaceful racial justice demonstrators and did so with the knowledge and authorization of the highest municipal policymakers including the Mayor of the District of Columbia and the Chief of Police.

5.     The Council of the District of Columbia repeatedly enacted legislation intended to stop

this unconstitutional police violence against protestors and bystanders. But this

legislation failed to stop the MPD's violence as in each instance the MPD willfully

insisted that it still had license to indiscriminately deploy less lethal weapons, including

sting ball shrapnel grenades, into crowds containing persons engaging in peaceful, lawful

protected activity and that its actions were outside the scope of the legislative restrictions.

6.     The MPD insisted that it could deploy munitions into and at entire groups of people

including peaceful protesters with no orders or warnings and claimed that doing so was

either not intended as dispersal and/or that they were justified in these wholesale attacks

so long as they alleged that one individual or a few individuals present engaged in

unlawful activity. The Constitution does not tolerate such indiscriminate and excessive

force.

7.     As of this date, peaceful racial justice demonstrators in the nation's capital seeking to

petition their government and challenge police abuse remain at high risk of punitive and

unconstitutional police violence and injury through the deployment of less lethal

projectile weapons and munitions.

8.     This lawsuit advances claims from four such incidents to challenge the municipal policies

which authorized these unlawful, unwarranted, punitive, and indiscriminate uses of force.

These incidents, occurring over four months, were not isolated incidents, but only four of

many incidents that occurred as part of the standard practice or policy of the MPD of

using unwarranted, excessive unconstitutional force against individuals exercising their

First Amendment rights to stand against police violence.

9.     The first two incidents herein occurred in late May 2020, a period in which law

3

enforcement acted to brutally repress the groundswell of protestors opposing police violence and seeking racial justice in the immediate aftermath of the police murder of George Floyd on May 25, 2020. The latter two incidents herein occurred in August 2020 at Black Lives Matter Plaza, so-named by the D.C. municipality ostensibly to create a welcoming and protected space for protest and assembly. The MPD at all four incidents barraged racial justice activists, without warning, with a cascade of less lethal weapons injuring them and extinguishing plaintiffs' First Amendment-protected activities.

10.     The MPD's practice was to discharge their less lethal weapons using groups of authorized officers who shot or deployed generally into crowds.

11.     The MPD's practice of discharging such volleys of weapons (with neither warnings nor lawful orders to disperse) reflected the authorized practice or custom of striking victims indiscriminately including peaceful protestors or bystanders.

12.     The MPD, as a matter of practice and custom, did not distinguish whom they struck with any individualized basis that would or could justify use of force, but rather attacked persons based on their being racial justice protestors or perceived as associating with racial justice protestors.

13.     The MPD, as a matter of policy, practice and custom of alleging misconduct of individuals within a larger crowd of peaceful demonstrators and using that allegation as a basis to unleash a wholesale violent assault on all those assembled and engaging in First-Amendment protected activity.

14.     The use of less lethal weapons was so prolific that plaintiff Elizabeth Ferris was struck on two separate occasions while protesting and livestreaming events as an independent reporter.

15. The indiscriminate nature of the MPD's use of less lethal weapons is most clearly manifested in their use of sting ball grenade munitions which they launched into crowds of people and, upon exploding, shot scores of hard rubber shrapnel in every direction, accompanied by a loud sound and a blinding light. This "flash-bang" element of the weapon, similar to stand-alone flash-bang or stun grenade weapons that the MPD is believed to have also deployed against protestors, creates sensory overload and is intended to incapacitate a person, to inhibit the ability of a person to correctly interpret their surroundings and to cause confusion.

16. Such weapons are by design inherently indiscriminate, and under MPD policy, practice, and custom, were launched by MPD into crowds of protestors without warning or notice.

17. The MPD also has a policy, practice and/or custom of using excessive force, including through the indiscriminate use of weapons, for the retaliatory infliction of pain on peaceful protestors challenging racist police violence.

18. The policy or custom authorizing the indiscriminate use of less lethal weapons, including the use of weapons that are inherently indiscriminate by design was, in effect and intent, the unlawful authorization by MPD and the District of Columbia of retaliatory strikes against protestors as well as unconstitutional excessive force.

19. This lawsuit brings injury claims against the municipality for the illegal practice of indiscriminately launching and/or launching indiscriminate weapons and munitions into protests, seeks court rulings holding this practice to be unconstitutional, holding unconstitutional the use of sting ball munitions in a manner as to cause injury to persons peacefully engaged in protest, and holding the District of Columbia accountable for the resultant harm to plaintiffs, each of whom were struck by such weapons.

## PARTIES

20. Plaintiff ELIZABETH FERRIS is a resident of Connecticut, who participated peacefully in demonstrations on May 31, 2020, and on August 30-31, 2020, among other dates. On these two particular dates, FERRIS was injured by the MPD using less lethal weapons while trying to livestream broadcast for the benefit of others. FERRIS is a military veteran, having served seven years including three and a half in active duty. At the of the time of these incidents, she was a student pursuing two masters degrees at Georgetown.

21. Plaintiff KATHERINE CROWDER is a resident of Virginia who was peacefully protesting police brutality and petitioning the government for change on May 30, 2020, when the MPD injured CROWDER using less lethal weapons.

22. Plaintiff HAZIE CRESPO is a resident of Washington, D.C. who was peacefully present at Black Lives Matter Plaza on August 29-30, 2020 when the MPD injured CRESPO using less lethal weapons.

23. Defendant DISTRICT OF COLUMBIA is a municipal corporation and constitutes the local government of Washington, D.C.

24. DOES 1-5 are unknown officers of the D.C. Metropolitan Police Department who, acting as a team or sub-unit, collectively used, deployed, authorized, directed the use, supervised, or otherwise participated directly in the use of less lethal weapons against CROWDER on May 30, 2020, specifically, and against the protest or First Amendment assembly with which she was associated, generally. Within this group, DOE 1, if they can be identified, is the officer who deployed the particular weapon that injured CROWDER, DOES 2 – 4 are the officers who, acting jointly with DOE 1, deployed weapons into the crowd at the time CROWDER was injured, and DOE 5 is the commanding officer who

authorized/directed the use of less lethal weapons at this scene on this date.

25.  DOES 6 – 10 are unknown officers of the D.C. Metropolitan Police Department who, acting as a team or sub-unit, collectively used, deployed, authorized, directed the use, supervised, or otherwise participated directly in the use of less lethal weapons against FERRIS on May 31, 2020, specifically, and against the protest or First Amendment assembly with which she was associated, generally. Within this group, DOE 6, if they can be identified, is the officer who deployed the particular weapon that injured FERRIS, DOES 7 – 9 are the officers who, acting jointly with DOE 6, deployed weapons into the crowd at the time FERRIS was injured, and DOE 10 is the commanding officer who authorized/directed the use of less lethal weapons at this scene on this date.

26.  DOES 11 – 15 are unknown officers of the D.C. Metropolitan Police Department who, acting as a team or sub-unit, collectively used, deployed, authorized, directed the use, supervised, or otherwise participated directly in the use of less lethal weapons against CRESPO on August 29, 2020, specifically, and against the protest or First Amendment assembly with which she was associated, generally. Within this group, DOE 11, if they can be identified, is the officer deployed the particular weapon that injured CRESPO, DOES 12 – 14 are the officers who, acting jointly with DOE 11, deployed weapons into the crowd at the time CRESPO was injured, and DOE 15 is the commanding officer who authorized/directed the use of less lethal weapons at this scene on this date.

27.  DOES 16 – 20 are unknown officers of the D.C. Metropolitan Police Department who, acting as a team or sub-unit, collectively used, deployed, authorized the use, directed the use, supervised, or otherwise participated directly in the use of less lethal weapons against FERRIS on or about August 31, 2020, specifically, and against the protest or First

Amendment assembly with which she was associated, generally. Within this group, DOE 16, if they can be identified, is the officer who deployed the particular weapon that injured FERRIS, DOES 17 – 19 are the officers who, acting jointly with DOE 16, deployed weapons into the crowd at the time FERRIS was injured, and DOE 20 is the commanding officer who authorized/directed the use of less lethal weapons at this scene on this date.

28.  In doing the acts and/or omissions alleged herein, each DOE defendant acted with reckless or callous indifference to the federally protected rights of the plaintiff each injured.

29.  In doing the acts and/or omissions alleged herein, each team of defendants as described above acted jointly and severally.

30.  The actions of DOES 1 – 20 were committed under color of law and authority as District of Columbia police officers, and while acting in that official capacity within the scope of their employment.

## JURISDICTION AND VENUE

31.  The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. Sec. 1331 (federal question), 28 U.S.C. Sec. 1343(a)(3) and (4) (civil rights jurisdiction), and 28 U.S.C. Sec. 1367 (supplemental jurisdiction).

32.  Venue is proper in this District under 28 U.S.C. Sec. 1391(e)(1) because all or a substantial part of the acts or omissions giving rise to the claims herein occurred in the District of Columbia.

## FACTS

33.  On May 25, 2020, George Floyd was murdered in Minneapolis by the police.

34.     In the aftermath of that murder, large crowds of protestors demanding justice peaceably assembled in cities across the country, including Washington, D.C.

35.     On repeated occasions in connection with these protests, the MPD used "less lethal" weapons to discourage, punish, retaliate against, inflict pain upon, suppress, extinguish, and deter peaceful protests against police violence within Washington, D.C.

36.     A less lethal projectile is any munition that may cause bodily injury or death through the transfer of kinetic energy and blunt force trauma, including rubber or foam-covered bullets, stun grenades and sting ball munitions.

37.     Intended outcomes of the use of less lethal weapons include disorientation, disruption, disabling incapacitation, seizure for arrest, pain, injury, and dispersal of First Amendment assemblies.

38.     Although some types of less lethal weapons can be and were deployed by hand, extended impact weapons were also used to launch some less lethal weapons further into crowds of protestors.

39.     MPD Standard Operating Procedure 16-01, Handling First Amendment Assemblies and Mass Demonstrations, in effect at the time of these events, identifies six levels of force: 1. Constructive force (e.g., uniformed police presence), 2. Physical force, 3. Oleoresin Capsicum (OC) Force, 4. Mechanical Force level I (use of tools and weapons to include the riot baton, ASP, and riot shield), level II (less lethal projectiles), 5. Chemical force, and 6. Deadly force.

40.     The use of kinetic impact projectiles, specifically including "sting ball munitions [and] extended impact weapons," were authorized by MPD as a relatively high order of force, as "Level II mechanical force" under SOP 16-01.

41.     Kinetic impact projectiles have a larger surface area than other ammunition and thus take
        unpredictable flight paths, resulting in reduced accuracy[1] and indiscriminate injury. They
        are relatively inaccurate at distances even within their potential maximum range.

42.     For the events at issue herein, officers discharging these kinetic impact weapons did so
        knowing that they were not targeting a particular individual but were simply shooting the
        weapon into a crowd.

43.     Officers discharged their weapons as a form of collective punishment and as a retaliatory
        pain-inflicting use of excessive force against racial justice protestors.

44.     The indiscriminate discharge of weapons, and/or the discharge of inherently
        indiscriminate weapons, into a First Amendment protected peaceful protest is an act of
        violence to retaliate against those peaceably assembled, collectively punish persons
        present, suppress and extinguish protected free speech activities and deter persons from
        joining protests or protesting in the future by making clear that participation in certain
        First Amendment activities risks the danger of police violence and injury.

45.     The MPD uses sting balls or hard rubber projectile grenade munitions in the context of
        First Amendment assemblies and protests including deploying these munitions into
        crowds of protestors.

46.     MPD training documents identify three types of less lethal grenades – all three containing
        .32 caliber rubber shrapnel: grenades with just the hard rubber shrapnel, the shrapnel and
        OC gas, and the shrapnel and CS gas.

---

[1]     Rohini Haar et al., *Death, Injury and Disability from Kinetic Impact Projectiles in Crowd
        Control Settings: A Systematic Review*, 7 BMJ Open no. 12, Dec. 2017, at 2,
        https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5736036/pdf/bmjopen-2017018154.pdf; *see
        also Kinetic Impact Projectiles*, Physicians for Hum. Rts., https://phr.org/wp-
        content/uploads/2020/06/PHR_INCLO_Fact_Sheet_Kinetic_Impact_Projectiles.pdf .

47.     Such sting ball or "less lethal" grenade munitions, by design, cause personal injury randomly to persons within a significant radius of the explosion of the grenade.

48.     These sting ball or "less lethal" grenade munitions are by design indiscriminate and cannot target any particular individual when launched into a crowd.

49.     One example of the typical characteristics of a sting ball munition, is the "Stinger Grenade," manufactured by Defense Technology, Inc. According to the manufacturer's specification sheet, a Stinger Grenade is a pyrotechnic device that blasts up to 180 rubber balls indiscriminately in a 50-foot radius (i.e., over a 7,800 square foot area) from its detonation point. The grenade can, optionally and additionally, deliver a chemical agent, either OC (Oleoesin Capsicum, commonly known as pepper spray) or CS (Chlorobenzylidenemalononitrile, commonly known as tear gas). The device is labeled that "IMPROPER USE . . . CAN RESULT IN DEATH OR SERIOUS BODILY INJURY." According to the Stinger Grenade's specification sheet, this munition "is generally reserved as a last selection" after other agents have failed to quell a violent disorder such as a prison riot.

50.     This "flash-bang" element of the sting ball weapon, similar to stand-alone flash-bang weapons that the MPD is believed to have also deployed against protestors, creates sensory overload and is intended to incapacitate a person, to inhibit the ability of a person to correctly interpret their surroundings and to cause confusion.

51.     By definition, less lethal projectiles can cause blunt force trauma, bodily injury, and death. It is extremely common for less lethal projectiles to cause contusions, abrasions, hematomas, and internal injuries.[2]

---

[2]   W. Bozeman & J. Winslow, *Medical Aspects of Less Lethal Weapons*, 5 The Internet Journal

52.     MPD is also believed to have used "flash-bang" pyrotechnic devices. Flash-bangs are also called "diversionary devices," "stun grenades," "concussion devices," or "distraction devices."

53.     Flash-bang stun grenades are pyrotechnic less lethal munitions that make a loud explosion, greater than 175 decibels, which is louder than a shotgun, and explode with a flash of blinding light, used to temporarily incapacitate, temporarily blind, or disorient individuals. The explosive force of these devices can cause major injuries if the device detonates near a person.[3] They may also cause injury from flying debris/shrapnel when the device explodes, injury from pressure waves created by the blast, and burns.[4]

54.     At all times, and for all plaintiffs referenced herein, the MPD was in command and control of the officers who used less lethal weapons against protestors and First Amendment assemblies, generally, and against the plaintiffs, specifically.

55.     The command structure at incidents was visibly manifest by the presence of white-shirted command officials.

56.     The underlying events involved deployments of officers in "civil disturbance units," a specific organizational structure which, according to MPD materials, is designed to

---

of Rescue and Disaster Medicine, no. 1, at 1, 3 (2004), https://print.ispub.com/api/0/ispub-article/7142; s*ee also* Will Stone & Carrie Feibel, *From 'Flash-bangs' To 'Rubber' Bullets: The Very Real Risks of 'Riot Control Agents'* NPR, (June 6, 2020, 10:29 a.m.), https://www.npr.org/sections/healthshots/2020/06/06/871423767/from-flash-bangs-to-rubber-bullets-the-very-realrisks-of-riot-control-agents.

[3]     Bozeman, *supra,* note 4, at 2, 3.

[4]     U.S. Gov't Accountability Office, *Law Enforcement: Federal Agencies Should Improve Reporting and Review of Less-Lethal Force,* GAO-22-104470, at 14 (Dec. 15, 2021), https://www.gao.gov/assets/gao-22-104470.pdf; s*ee also* Physicians for Hum. Rts., *supra* note 2, at 1 ("[T]he potential for injuries caused by the pressure of the blast or by shrapnel from the fragmentation of the grenade is disproportionately high and could even lead to death").

facilitate command, control, and communication. Additionally, the structure allows for authority and accountability.  Civil disturbance units (CDUs) are organized into platoons commanded by a lieutenant, and each platoon is comprised of squads which are each commanded by a sergeant. Within the deployment, a relatively smaller number of officers are armed with and authorized to use less lethal weapons.

57.     In some or all of the underlying events, the MPD was fully mobilized for mass demonstration activity.

58.     As per policy, in such circumstances, the Chief of Police, as the commanding official, oversees all police activities during CDU activation. Peter Newsham, the then Chief of Police, was the commanding official, overseeing police activities against demonstrators for all events herein.

59.     In addition to the constant monitoring and coordination employed by the MPD's Command Information Center (CIC), during the events in question the Joint Operations Control Center (JOCC) was also activated. The JOCC is activated when CDU units are deployed, during major events, and/or when First Amendment Activities are occurring. The JOCC is a centralized command and control center that receives, processes and relays real time information from personnel reporting on the ground as well as from live feeds displaying images from the network of the District's CCTV cameras. Commands are also issued from the JOCC to personnel on the ground as to the events being monitored.

60.     The use of less lethal weapons described herein was in full compliance with MPD policy, practice, and custom.

61.     In each of the underlying events, less lethal weapons were used, in whole or in part, with

the intent to temporarily incapacitate, arrest, move, collectively punish and/or retaliate against those struck because they were exercising their constitutionally protect right to peacefully protest.

### MPD'S POLICIES, PRACTICES, AND/OR CUSTOMS OF DISCHARGING LESS LETHAL WEAPONS INTO GROUPS OF PEACEFULLY ASSEMBLED PROTESTORS

62.  The municipality has been on notice as to the policy, practice, and training deficits as to its use of less lethal weapons in the context of demonstration activity.

63.  In connection with an investigation into use of force at demonstrations related to the 2017 Presidential Inauguration, the District of Columbia Office of Police Complaints observed and found:

   a.  "[T]hat less than lethal weapons were used indiscriminately and without adequate warnings in certain instances." D.C. Office of Police Complaints, *OPC Monitoring of the Inauguration, January 20, 2017, Report and Recommendations of the Police Complaint Board to Mayor Muriel Bowser, the Council of the District of Columbia, and Interim Chief of Police Peter Newsham* (Feb. 27, 2017) at 7.

   b.  That Standard Operating Procedure [SOP] "permits the use of less than lethal weapons at First Amendment assemblies, it does not provide a specific procedure to follow for their use. . .. The SOP is silent as to whether a warning is required in advance of deploying a less than lethal weapon. It is evidence that this lack of direction in the SOP led to widespread use of the weapons on inauguration day, and they appeared to be deployed as a means of crowd control, and not necessarily in response to an unlawful action." *Id*. at 8.

   c.  "The Standard Operating Procedure for Handling First Amendment Assemblies should be reviewed and updated to include that warnings should be given when

14

practical for all uses of less than lethal weapons in a crowd control situation, and there should be written guidance on the proper deployment and use of each less than lethal weapon. OPS monitors observed multiple instances over the course of several hours where less than lethal weapons were used and no warning or commands to the crowd preceded their use. The SOP gives very little direction on when and how to deploy less than lethal weapons for crowd control, and there should be more guidance in place to ensure that their use is not indiscriminate or unreasonably dangerous." *Id*. at 10.

64.    Defendants' actions in this case were pursuant to the District of Columbia's specific standard operating procedures for handling First Amendment assemblies and other large-scale demonstrations.

65.    At the time of the events at issue, the MPD maintained an express policy generally authorizing the use of less lethal weapons specifically in the context of First Amendment protected assemblies and demonstrations.

66.    MPD's policy did not restrict the use of less lethal weapons to situations involving violence but expressly authorized the use of less lethal weapons in the context of conduct which may be non-violent, such as allegedly blocking traffic or the entry to a building and for crowd control.

67.    MPD policy expressly authorized, within the category of less lethal weapons generally, the use of inherently indiscriminate munitions, such as sting ball munitions, in the context of protest activity.

68.    At the time of these events, the MPD maintained a policy, practice, and/or custom of:

a.   authorizing the discharge of less lethal weapons, including projectiles, for the purpose

of controlling or suppressing or handling First Amendment assemblies and mass demonstrations;

b.  authorizing the discharge of less lethal weapons, including projectiles and flash-bang stun and shrapnel grenades against persons engaging in non-violent conduct and into groups of persons containing persons peacefully participating in demonstration activity or assembly;

c.  authorizing the launching of less lethal weapons, including projectiles and flash-bang stun and shrapnel grenades, into groups containing peaceful protestors in the absence of audible warnings that it intended to do so;

d.  authorizing the launching of less lethal weapons, including projectiles and flash-bang stun and shrapnel grenades, into groups containing peaceful protestors in the absence of any lawfully issued orders to disperse the area of impact followed by meaningful opportunity to disperse; and

e.  authorizing the deployment into crowds of inherently indiscriminate weapons, i.e., skip-fired or indirect fired projectiles/grenades which contain pellets, projectile, or shrapnel that disperse in a non-directional, non-target specific manner, including specifically sting ball munitions that use force and cause injury randomly against persons within impact range.

69.  The MPD maintained a pattern, practice and custom of deploying flash-bang devices and other projectile devices emitting incapacitating light, sound, and optionally chemical agents, into crowds and not at a safe distance from persons.

70.  The MPD maintained a pattern, practice and custom of deploying less lethal projectile weapons in the absence of imminent actual or threatened acts of serious bodily injury.

71. The MPD maintained a policy, pattern, practice and custom of using the alleged misconduct of individuals to target a crowd generally with less lethal projectile weapons.

72. The MPD maintained a pattern, practice and custom of deploying less lethal weapons without attempting de-escalation techniques or other alternatives to force.

73. The MPD maintained a policy, pattern, practice and custom of deploying less lethal weapons into crowds without considering whether such deployment would endanger peaceful crowd members or bystanders.

74. The effect of the above-referenced authorizations was a policy, practice, and/or custom authorizing the intentional use of less lethal weapons against groups of protestors without regard to the rights of the peaceful individuals within those groups to be free from police seizures and violence; without warnings; and failing to distinguish persons engaged in non-violent and legal conduct from any persons against whom police may have a lawful basis to engage in law enforcement action.

75. These policies, practices, and/or customs are evidenced by the multiple occasions in connection with the Floyd protests during 2020 that the MPD repeatedly used less lethal weapons against groups containing peaceful demonstrators without warning or order to disperse, as well as during the protests at the 2017 Inauguration that were the subject of the OPC report.

76. On June 9, July 22, and October 28, 2020, the D.C. Council enacted emergency legislation to restrict the use of less lethal weaponry, including to prohibit the use of less lethal projectiles for the purpose of dispersing First Amendment assemblies.

77. The legislation did not have the effect of stopping the unlawful practices regarding use of less lethal projectiles by the MPD.

78. During the underlying events in this Complaint, the MPD officers were under intact command and control. It was the policy, practice, and/or custom that, in responding to First Amendment assemblies, teams of officers were used with specific authority to carry and deploy less lethal weapons, including sting ball grenades and extended range impact weapon launchers. Those officers acted as a unit or team, discharging less lethal weapons into crowds of peaceful protestors.

79. The events at issue herein involved protests whose messages included calling for the defunding of police and an end to systemic racist violence by police. A motivation for the use of unlawful force against these protests was to retaliate for the substance of this message and to intimidate and chill persons from participation in the protests to deter such speech.

80. The DISTRICT OF COLUMBIA acted with deliberate indifference to the constitutional rights of protestors by failing to properly train, supervise, and discipline officers regarding the use of less lethal weapons in the context of persons engaged in peaceful demonstration activity. This includes a failure to properly supervise and train as to:

a. The necessity of audible warnings or lawful orders to disperse and opportunity to do so prior to use of less lethal weapons;

b.  measures to ensure that - - to the extent ever justified and appropriate in the context of an activity that began as or transformed into a First Amendment activity - - less lethal weapons are not used in a manner likely to cause impact or injury to persons who are peacefully participating in protest activity or who have committed no crime or conduct giving rise to justification for use of force; and

c. banning or strictly restricting inherently indiscriminate less lethal weapons (such as

stinger grenade shrapnel munitions) from use in protest situations where likely to cause impact or injury to persons who are peacefully participating in protest activity or who have committed no crime giving rise to justification for the use of force; and

    d.   restrictions on the use of kinetic energy less lethal projectile weapons, including flash-bang stun grenades, so as to not explode in close proximity to persons.

81. The DISTRICT OF COLUMBIA has failed to supervise and hold accountable officers under its control for:

    a.   interfering with people's First Amendment rights to freedom of speech, assembly, and association;

    b.   for acting in retaliation against peaceful protestors for the exercise of their First Amendment rights; and

    c.   for engaging in excessive force with the discharge of less lethal weapons against persons exercising their First Amendment rights.

82. Among other things, the DISTRICT OF COLUMBIA has inadequate accountability, oversight and review as to the use of less lethal weapons, including as evidenced by the lack of individualized use of force reports, which sends a message to officers that they will not be held accountable for inappropriate or unsafe use.

83. The aforementioned policies, practices, and/or customs authorized the discharge of indiscriminate weapons into groups that officers knew or should have known contained peaceful protestors for whom there was no justification to use force against, and who had not been subject to audible warnings or lawful orders to disperse, and which caused the injuries to plaintiffs.

84. These policies, practices, and/or customs retaliated against persons, including plaintiffs,

for exercising their constitutional rights to freedom of speech, peaceable assembly, or other rights secured by the First Amendment to the U.S. Constitution to challenge and oppose police conduct.

85.   These policies, practices, and/or customs violated rights of persons, including plaintiffs, struck by such weapons and munitions to be free of unreasonable seizures, rights secured by the Fourth Amendment to the U.S. Constitution.

86.   The municipal policies, practices and customs complained of herein within this Complaint were enacted or effected with deliberate indifference to the rights of those affected, including plaintiffs, to be free from constitutional violations.

87.   Municipal policymakers were on notice as to the actual manner, pattern, practice, and custom of the use of less lethal weapons in connection with the protests at issue.

88.   On May 31, 2020, surveying the use of weaponry the night prior, and which continued on subsequent nights, Mayor Muriel Bowser and Police Chief Peter Newsham held a press conference defending and justifying police actions.

89.   At the press conference, the Chief acknowledged "the police deployed OC spray and stingballs." Both made clear that they were on notice as to police actions: Chief Newsham was in the field through the day and Mayor Bowser surveyed the street scene with the Chief and was kept up to date. The Mayor explained, "The Chief and the MPD had certainly been deployed throughout that evening providing me updates throughout the night on major events and things happening." Reflecting ongoing knowledge, the Chief asserted that "we will do after actions [reports] as we do whenever we have an instance like this to make sure we do it better next time."

90.   Chief Newsham and the Mayor continued to maintain close situational awareness of

MPD deployments, practices, and customs regarding the mass demonstrations throughout the subsequent months, as events unfolded.

91.     Media attention and reports were frequent, as the protests and police actions were the subject of high public interest.

92.     Chief Newsham expressed his notice, knowledge, and ratification that the police targeted entire assemblies which contained non-violent protestors with less lethal weapons if the police form the belief or allegation that there were individuals within a group of otherwise peaceful demonstrators who had committed or who were committing unlawful acts using the purported basis that the entire assembly was no longer protected as a protest and thus all persons assembled were no longer safe from use of force. On the September 4, 2020, *Kojo Nnamdi Show*, referencing the demonstrations and police actions occurring between Friday, August 28, 2020, and the early morning hours of Monday, August 31, 2020, described below and the subject of this Complaint, he explained, "A lot of people have raised the issue of whether or not using pepper spray or munitions in that circumstance is legal. It is. Because that is not a protest, those are not protestors. Those are people who have violated the law and the police are allowed to protect themselves and restore order when those things happen."

93.     Mayor Bower stated notice, knowledge, and ratification of the indiscriminate police actions. At a press conference held by Mayor Bowser and attended by Chief Newsham on August 31, 2020, the Mayor was asked by a reporter about what she wished to say to "D.C. residents who contend that there is indiscriminate police response and that they are getting caught up in it." Mayor Bowser responded that "the problem is ...there are people who are there to protest racial injustice and demand that the government respond.

Unfortunately, when they are among people, or there are people among them, who are doing uh who are creating chaos and violence against the police it is hard to distinguish between them all."

### MPD'S SUSPENSION OF THEIR STANDARD USE OF FORCE REPORTING WHEN FORCE IS USED AT FIRST AMENDMENT ASSEMBLIES AND MASS DEMONSTRATIONS

94.     In addition, the policy and procedure of the MPD was to suspend its standard obligations to report the use of force (as set forth in General Order RAR 901.07) by its officers when force is used in the context of First Amendment assemblies and mass demonstrations. This policy reflects the deliberate indifference of the MPD to the rights of protestors to be free of police misconduct, retaliation for First Amendment and free speech activities, and excessive force. This policy sent a message to officers that using excessive force and misusing less lethal weapons would not be accounted for, not reviewed, and not punished, thereby providing a green light for the unlawful and unconstitutional use of force against protestors.

95.     The standard requirements for mandatory reporting of an officer's use of force is a measure to establish systems of reporting, review, and accountability for that officer's use of force against civilians. Under the standard reporting system at the time of the events, an officer who engaged in a "reportable use of force," specifically including any use of a less lethal weapon, was required to individually complete a written use of force report. *See* GO-RAR-901.07 ("Use of Force"), Sec. III (13)(a) (defining "reportable uses of force" as any "[u]se of a less-than-lethal weapon") (effective Nov. 3, 2017).

96.     The MPD, as a matter of express policy, suspended or exempted use of force in the context of mass demonstrations from standard reporting requirements. An officer who

engaged in the use of force during a demonstration, to include use of any less lethal weapons, was <u>not</u> required to complete a written use of force report.

97.     MPD policy provided that, in connection with First Amendment assemblies, the standard "use of force reporting, documentation, and investigative processes . . . may raise practical, logistical, and safety-related concerns depending on the incident. Accordingly, the [alternate] reporting, documentation, and investigative procedures for use of force . . . shall be used for First Amendment assemblies and mass demonstration situations." *See* SOP-16-01, Handling First Amendment Assemblies and Mass Demonstrations; GO-HSC801-01 II.(M) Crowd Management and Civil Unrest (superseding and current order, substantially similar); GO-RAR-901.07 IV (H) (directing that reporting use of less lethal weapons follows the alternate procedures set forth in SOP-16-01) (effective Nov. 3, 2017).

98.     Under the alternate reporting process used for First Amendment assemblies at the time, only one summary use of force report was required to be made, <u>not</u> by the officer who engaged in use of force, but rather, on an overarching basis by a ranking official who directed the uses of force for an entire squad or platoon. *See* SOP-16-01, Attachment L. This policy renders opaque the identity of which officers engaged in which uses of force, against whom it was used, and which type of force each officer used. This alternate reporting prevents any review and accountability for any individual officer's use of force against protestors, including when there are bodily injuries from less lethal weapons.

99.     The suspension of individual officer use of force reporting was a policy, practice, and/or custom of the municipality that led to the injuries to plaintiffs.

100.    The District of Columbia has been on notice to this policy as a cause of excessive force

against protestors. *See Alliance for Global Justice, et al. v. District of Columbia, et al.*, 1-cv-00811-PLF-JMF (ECF No. 323, Report and Recommendation) (a reasonable juror could find the use of force against protestor-plaintiffs was pursuant to a municipal policy or practice where MPD suspended standard use of force reporting in mass demonstrations thereby rendering the use of excessive force more likely) (Feb. 28, 2008).

### EVENTS RELATED TO MAY 30, 2020 – KATHERINE CROWDER

101.    On May 30, 2020, CROWDER came to the nation's capital to join protests demanding an end to racist police violence.

102.    In both the District of Columbia and the nation, May 30-31, 2020, were part of a series of consecutive days of growing activism and outrage, petitioning for redress of grievances and exercising of First Amendment rights, as people across the country poured into the streets demanding an end to racist police violence in the immediate aftermath of the murder of George Floyd.

103.    CROWDER wanted to join with the millions of people around the country standing up for racial justice and believed that going to Washington, D.C., the nation's capital, was the most impactful location to lend her voice to demand social change and to petition the government.

104.    CROWDER joined with other protestors marching through the streets, chanting, holding signs, and peacefully petitioning for racial justice and for the end of police brutality.

105.    It is not unlawful to march on the District of Columbia's streets in the absence of a permit and no permit is required to do so.

106.    CROWDER was peacefully protesting, marching throughout the city for over seven hours on that day.

107.   At approximately 10:00 p.m., protestors continued to chant as they marched down 17th Street NW, where, at the intersection of 17th and K Street NW, they were met with a line of MPD officers across K Street, in riot gear, who were blockading protestors from moving West on K Street.

108.   CROWDER and the protestors gathered on the opposite side of the crosswalk from the riot-gear clad MPD officers blocking K Street and faced the officers as they continued chanting.

109.   The protestors were peaceful.

110.   CROWDER and the protestors were on one side of the crosswalk, while the MPD officers had erected a police line on the opposite side of the same crosswalk, facing the protestors.

111.   Without lawful basis, a MPD officer began pepper spraying peaceful protestors who were trying to film the police. CROWDER perceived that the protestors being targeted appeared to be Black.

112.   CROWDER began to verbally question the unknown MPD officer about his unprovoked use of pepper spray into the face of a peaceful, non-threatening protestor.

113.   CROWDER spoke to that officer, stating something to the effect of "Why did you do that?! He did nothing to you! Show some self-control!"

114.   CROWDER resumed the chants with the protestors.

115.   Seconds later, and without warning, MPD DOES 1-4 began intentionally discharging less lethal weapons into the crowd of peaceful protestors.  On information and belief, this team's use of force was directed by a commanding official, DOE 5.

116.   The first unknown less lethal device exploded against CROWDER.

117.  The unknown device exploded with a loud bang, then a flash of blinding light, and finally releasing a smoke or gas.

118.  The explosion was caught on video and CROWDER in the still images with a yellow arrow.







119.   As the device exploded, it sent shrapnel or projectiles flying into the air.

120.   The exploding shrapnel or projectiles struck CROWDER's arm, cracking against her elbow, breaking the skin in three spots.

121.   Other exploding less lethal munitions were thrown into the crowd.

122.   CROWDER turned and began running away from the exploding devices and the MPD while cradling her injured elbow.

123.   As CROWDER tried to escape to safety, a second unknown device exploded near her as she ran.

124.   The second device thrown near CROWDER's feet can be seen landing and then exploding in the following images.





125.   CROWDER heard no orders or directives from police.

126.   No orders or directives were issued to CROWDER.

127.   CROWDER did not fail to comply with any lawful order issued to her.

128.   CROWDER always remained non-threatening and peaceful, and did not engage in any destructive activity.

129.   At no time did CROWDER violate the law nor was she suspected of a crime.

130.   DOES 1-5 were aware that CROWDER was peaceful and did not violate any law.

131.    There was no legal basis whatsoever for the use of force.

132.    An effect of this use of force was the termination of CROWDER's First Amendment protected activities.

133.    Officers DOE 1-4 discharged the exploding devices into the crowd of peaceful protestors, knowing that they would strike CROWDER and other persons who were associated with this political protest who had not violated any law, who had not failed to comply with any lawful order, who had received no warning and/or directive to clear the area, and who were utterly vulnerable to wound or injury from the exploding projectiles/shrapnel expelled into the dense crowd.

134.    The use of this indiscriminate weapon under these circumstances was authorized by MPD superiors.

135.    CROWDER's arm was cut and bruised as a result of the exploding devices. Her injuries can be seen in this picture taken in the days after.



136.    The bruising, contusions, pain, and emotional damage remained for months.

137.    In the aftermath of the assault, CROWDER sought accountability and information regarding the police attack and was instead misled and stonewalled by D.C. authorities.

138.    On June 3, 2020, CROWDER filed a complaint with the D.C. Office of Police
Complaints ("OPC") about this incident.

139.    CROWDER followed up with the OPC, made herself available for interview, provided a
statement, and provided an image showing the police line from the side with the MPD
police patch visible on the arm of an officer's uniform.

140.    On June 15, 2020, OPC closed its investigation into CROWDER's complaint stating that
the officers involved were not the MPD and directing CROWDER to contact the Secret
Service instead.

141.    CROWDER sought information from the Secret Service who ultimately had no records
of the incident.

142.    CROWDER reached back out to the OPC trying to get more information about the OPC's
investigation and its findings which had wrongly asserted that MPD officers were not
involved.  OPC told her she would have to file a FOIA request for information from the
investigation into her own complaint.

143.    On September 3, 2020, CROWDER asked the OPC to review additional photos of the
officers at issue and stated that "MPD can be seen in white lettering on the back of some
of their helmets." CROWDER requested she be notified of any findings or additional
steps that would be taken based upon these additional photographs.

144.    That same day, an OPC supervisor responded to CROWDER and stated that her
complaint was closed, despite the photographic evidence presented showing "MPDC"
printed on the helmets. The supervisor stated the complaint was closed because:

> After reviewing your statement, the description of the officers involved and
> the Office of Police Complaints (OPC) familiarity with the different law
> enforcement agencies present at the First Amendment demonstrations, OPC
> concluded that the subject officers were not from the Metropolitan Police

Department (MPD). Based on your description and our knowledge of officer uniforms, OPC determined the subject officers, who were wearing all black uniforms with the word "Police," are from the Secret Service Uniformed Division. During the protests, MPD officers were wearing navy blue uniforms with "Metropolitan Police" on the uniform vest and helmets with "MPDC." You can file your complaint with the Secret Service Uniformed Division at 202.406.5748.

This was the second time that OPC declined to investigate her complaint and told her to file a complaint with the Secret Service, dismissing the fact that CROWDER already communicated with and received a response from the Secret Service.

145. CROWDER promptly responded requesting the complaint be considered based upon the MPD officers at the scene at the time and the photographic evidence. CROWDER provided the supervisor with the same information she already provided the investigator – the specific photo showing the "MPDC" on the back of the helmets and also that the Secret Service found no use of force reports for this date, time, and location.

146. The officers blocking K Street did in fact have "MPDC" printed on the back of their helmets, "Metropolitan Police" printed on the back of their vests and had the MPD patch on the side of the uniforms and the OPC, including the supervisor and the investigator, were in possession of that information.

147. In response to OPC's insistence that officers at issue were not from the MPD, despite photographs and other evidence to the contrary, CROWDER asked the OPC to identify if *any* MPD officers were present at the time and location of the subject incident since "MPD was on the backs of the helmets in the photos."

148. On September 4, 2020, the OPC supervisor refused to provide CROWDER information regarding whether any MPD officers were deployed to the scene on the date and time of the incident on the basis that, because the OPC had already decided that the officers

CROWDER had reported were not MPD officers, the OPC would not "identify for you if any MPD officers were present" because they were thus "not the subject of your complaint," and once again encouraged her to file a complaint against the Secret Service. OPC explained, "we are familiar with law enforcement agency uniforms, which is why we identified the officers as Secret Service Uniformed Division."

149.   Determined to obtain information and accountability, after the third time OPC told CROWDER to file a complaint against the Secret Service despite photographic evidence proving the officers at the scene were in fact MPD officers, CROWDER again requested her claim be elevated to a higher-level supervisor.

150.   On September 24, 2020, the OPC executive director agreed to re-open the investigation.

151.   CROWDER followed up requesting updates on the status of her complaint in October and December and was told the investigation is ongoing "due to the amount of evidence being reviewed."

152.   Ultimately, OPC sent CROWDER a letter on January 14, 2021, stating they dismissed her complaint because "after reviewing the evidence, OPC was unable to identify the specific MPD officers involved in the specific allegations you raised. We were able to determine from video evidence that the officers generally involved in the allegation of flashbang deployment acted within policy."

153.   CROWDER also filed a FOIA request with the MPD for the use of force reports involving "NFDDs (flashbangs)"[5] on May 30-31, 2020. MPD responded that there are no records on the asserted basis that MPD "does not deploy. . .  flash bang grenades."

154.   CROWDER filed a FOIA request with the MPD for the Commander's Mass

---

[5] NFDD is a law enforcement acronym for Noise and Flash Diversionary Devices.

Demonstration Event Logs for May 30-31, 2020. Pursuant to MPD materials, the unit or incident commander was required to direct entries of all significant events into PD Form 759-B, the "Commander's Mass Demonstration Log," to include all observed "[o]ccasions requiring the use of force. Entries should include the circumstances, type of force used, duration, and effect." The MPD informed her that there were no responsive records, despite the requirement that such records be created. As a matter of de facto policy, custom and established practice, the MPD did not complete PD Form 759-Bs.

155. Trying every avenue for information and accountability regarding the police violence inflicted against her and others, CROWDER filed a FOIA request with the MPD for the body-worn-camera video from the officers present that night.

156. MPD's response to CROWDER's FOIA request was to inform her that she would have to pay $27,972.00 before MPD would begin the search for responsive information. The MPD also informed her that the faces of officers would be blurred out of any responsive video footage, despite the fact that officers were on official duty, in public, when the events occurred.

157. CROWDER appealed this determination to the Mayor's Office which responded to her with its determination that requiring $27,972 was not excessive and thus was not a constructive denial of her request.

158. CROWDER tried to seek accountability, transparency, and information regarding the police violence inflicted on herself and the other racial justice protestors through every available avenue of the District's government. At every step, government offices and officials acted to conceal and cloak police misconduct and evade police accountability.

159. As a direct and proximate result of these unlawful actions, CROWDER has sustained

injury and damages, including physical injury, mental anguish, distress, and pain and suffering.

160. CROWDER submitted a notice of claim pursuant to D.C. Code §12-309 on November 25, 2020.

**EVENTS RELATED TO MAY 31, 2020 – ELIZABETH FERRIS**

161. ELIZABETH FERRIS was present in the early evening hours of May 31, 2020, in proximity to Lafayette Park near the White House.

162. FERRIS was present to engage in political expression, to show that those who are not victims of systemic racism stand in solidarity with both the Black community under attack and the Black Lives Matter racial justice movement in the fight for racial justice.

163. FERRIS was also present to report as an independent member of the media using social media to transmit images and her narrative with analysis of the events relating to the protests unfolding in the streets, police violence, and the related racial justice movements. FERRIS sought to raise awareness in her community back home to educate and to change people's understanding and awareness of policing outside their community. She sought to document and show her community the reality of the police conduct on the ground.

164. FERRIS was live streaming the day's protests and events, including commenting on the events she observed and experienced at approximately 7:15 p.m., in or near the 1400 block of H Street NW, between 14th Street and 15th Street, NW, as an independent reporter.

165. At this time, protestors were marching peaceably eastward in the direction of the U.S. Capitol.

166. Many protestors carried political signs against police brutality and in favor of racial

justice.

167.   Many were marching with their hands up chanting, "Don't shoot."

168.   Outside of FERRIS' view, the front of the march encountered a police line across the roadway, causing confusion and disruption of the protestors' orderly and peaceful movement.

169.   FERRIS, reporting via livestream, narrated, "I'm not sure what happened. Everything was a very peaceful march heading towards the Capitol."

170.   FERRIS was not able to see the front of the march from where she was.

171.   No orders or directives from police were issued to FERRIS.

172.   A few minutes later, FERRIS moved further through the crowd and observed the line of police across the street blocking passage and forward movement with many protestors stopped where they were facing that line.

173.   The observed protestors present were non-confrontational.

174.   Some held signs over their heads.

175.   A chant rose from the peaceably assembled crowd, "Hands Up, Don't Shoot!"

176.   Many of the protestors, who were loosely assembled on the roadway, took a knee facing the police line, and raised their hands, in a non-confrontational and symbolic show both of non-aggression and as a statement against racism and racist police violence memorialized by Colin Kaepernick's taking a knee at the start of football games.



177.  In contrast, the MPD officers in the police line were outfitted in riot gear with hardened helmets and visors, and armed with weapons.

178.  The police line was structured and orderly with command officials in white shirts present.

179.  Within and behind the first line of police officers were multiple officers armed with less lethal weapons, to include projectile grenades and launchers.

180.  No less than three officers were observed on this police line with bright orange less lethal launchers. The following depicts one such officer.



181.  When FERRIS first saw the police line, MPD officers were positioned with batons out at waist level but were not at that moment forward aggressing.

182.  FERRIS heard no directives from police.

183.  Officers issued no directives to FERRIS.

184.  Without warning, notice, or justification, officers moved aggressively forward striking outward with their batons.

185.  Some officers maintained two hands on their batons.

186.  Other officers released one hand from their baton to permit an even greater range of motion and potential injury with their swinging weapons.

187.  Some officers discharged a chemical agent, on information and belief, pepper spray, into the eyes of protestors without warning, provocation, or justification.

188.  One protestor shouted, "We are unarmed! We have no weapon! *What are you doing*?"

189.  Video from an observer located close to the police line depicts multiple MPD officers carrying extended impact launchers, firing into the crowd, reloading, then refiring into the crowd.

190.  Officers acted as a team, launching, firing, and deploying the projectile impact less lethal

weapons.

191.    Each was participating as a team member in the volleys of less lethal weapons deployed knowingly into the general crowd of protestors without concern regarding whom they ultimately hit.

192.    FERRIS, approximately 50 feet from the police line, continued to livestream events so that the public could see this unprovoked police violence from a non-mainstream media source on the front line.

193.    Observing a woman in obvious pain and distress, who had apparently been pepper sprayed in the face, FERRIS moved to her to lend care and assistance.

194.    Without warning, notice, excuse or justification, one or multiple MPD officers (Officers DOE 6 - 9) knowingly and intentionally deployed less lethal weapons, one of which exploded near FERRIS, shooting outward high kinetic energy and high impact hard shrapnel projectiles indiscriminately.

195.    When struck, FERRIS cried out in anguish and pain from the impact of the projectiles.

196.    On information and belief, the less lethal weapon deployed was a sting ball munition.

197.    The weapon was used and deployed indiscriminately at the crowd of persons engaged in peaceful First Amendment protected activities.

198.    Additionally, by its nature, the weapon's munition exploded with indiscriminate widespread impacts against persons engaged in First Amendment protected peaceful activities.

199.    Officers DOE 6 - 9 intentionally deployed their less lethal weapons with knowledge that such deployment was indiscriminate and non-target specific, without concern or regard as to who was ultimately hit by the weapon.

200.   Officers DOE 6 - 9 deployed their weapons with knowledge that they were deployed into a lawful and peaceful assembly of persons engaged and associated with political protest, as well as media, engaged in protected First Amendment activities.

201.   Officers DOE 6 - 9 deployed their weapons knowing that they would strike FERRIS or other persons who, like FERRIS, were associated with political protest, had not violated any law, had not failed to comply with a lawful order of a police officer, had received no warning and/or directive to clear the area, and were utterly vulnerable to wound or injury from the expelled shrapnel projectiles.

202.   On information and belief, the discharge of this indiscriminate weapon into an area within which were assembled persons engaged in non-criminal, non-violent political protest was authorized by a command official in the field at the scene, DOE 10.

203.   There was no legal basis whatsoever for the use of force.

204.   The use of this indiscriminate weapon under these circumstances was authorized by MPD superiors and by MPD policy.

205.   There were no circumstances that prevented or impaired MPD's command and control of its officers.

206.   At all times relevant to these allegations, the involved MPD officers were acting at and within the established control structure and chain-of-command of the MPD.

207.   On information and belief, command officials on scene were in communication with operational command centers and were engaging in tactics and actions, including the discharge of "less lethal" weapons, which were authorized at the highest level of MPD authority.

208.   FERRIS' leg was, in fact, hit by multiple projectiles, at least nine based on the resultant

wounds. The pattern of the wounds is consistent with use of a sting ball munition or similar weapon.

209.   The projectiles broke FERRIS' skin, causing bruising, welts, bleeding, injury, and physical and emotional damage.

210.   The following is an accurate depiction of the resultant injuries taken the same day:



211.   As a direct and proximate result of these unlawful actions, FERRIS has sustained injury and damages, including physical injury, mental anguish, distress, and pain and suffering.

212.   FERRIS submitted a notice of claim pursuant to D.C. Code §12-309 regarding this incident on November 25, 2020.

### THE CREATION OF BLACK LIVES MATTER PLAZA

213.   In the aftermath of the June 1, 2020, violent assault on and clearing of people in the areas around Lafayette Park culminating in a photo-op of then-President Trump holding a bible, on June 5, 2020, Mayor Muriel Bowser established Black Lives Matter Plaza ("BLM Plaza") on 16th Street between H Street and K Street, N.W.  The Mayor engaged in many national press appearances to announce BLM Plaza as a response to the Trump Administration's hostility to, and violence against, racial justice protestors near the White House. She made no acknowledgement of the violence by the District's own MPD against racial justice protestors during this same period, nor did she subsequently as such MPD violence continued.

214.   At that time, BLM Plaza was demarcated by barriers to prevent vehicular use of the roadway and to designate a welcoming space for assembly, free expression, and mass demonstrations.

215.   According to an October 28, 2021, press release by Mayor Bowser, BLM Plaza was established as a refuge from police misconduct. "In June 2020, Mayor Bowser unveiled the iconic art installation on the two-block stretch of 16th Street NW that leads to the White House, transforming it to a pedestrian-only space and naming the area Black Lives Matter Plaza. The mural was unveiled just four days after unidentifiable federal forces roamed local DC streets and peaceful demonstrators, protesting police brutality and racial injustice were met with violence and tear gas between Lafayette Park and St. John's Church, near the current site of the plaza."

216.   According to that same press statement, "The 48-foot-wide mural would become a permanent installation . . . and serve as a safe gathering space for pedestrians wanting to

fully experience the mural's impact."

217.    Mayor Bowser expressly created BLM Plaza to establish a safe place for assembly in the

face of arbitrary police misconduct. In an interview with *Essence* magazine, the Mayor

explained:

> A day earlier there had been federal troops who had blocked that portion of
> 16th street, which is a DC street. And we certainly want to reclaim it for our
> use [including] protesting as part of the demonstrations against George
> Floyd's death.
>
> We also thought having an affirming message where people could come
> safely and address their government with the message of "Black Lives
> Matter" was very important at this point in our country, following the
> Monday incident where federal forces used some kind of gas to disperse
> peaceful protestors.

Breanna Edwards, June 12, 2020, *Mayor Muriel Bowser Talks About Black Lives Matter
Plaza and Police Reform Amid Outcry to Defund Police*
(https://www.essence.com/feature/black-lives-matter-plaza-muriel-bowser/)

218.    The Council of the District of Columbia ultimately enacted a law making the designation

of the BLM Plaza permanent.

**EVENTS RELATED TO AUGUST 29, 2020 – HAZIE CRESPO**

219.    On the evening of Saturday, August 29, 2020, HAZIE CRESPO had friends visiting

Washington, D.C., and they went to BLM Plaza, which she knew was associated with

support for the BLM movement and the anti-racist issues it represents.

220.    They approached BLM Plaza by scooter at approximately 11:30 p.m.

221.    CRESPO heard music and observed groups of people peacefully engaging in expression

and assembly in the Plaza.

222.    Video from the scene at 16th & K Street NW depicts a calm and unremarkable scene at

11:42:01 p.m., with no police line.

42



223.    Without notice, scores of officers in a police formation began moving forward on 16th

Street from the direction of H Street, towards K Street at the north side of the Plaza.

224.    The officers in the progressing police line had their batons out and chanted, "Move

Back!" and, with apparent arbitrariness, forced out everyone who had been peacefully

assembled in the Plaza.

225.    In the ensuing chaos of this indiscriminate police action, which threatened to topple over

otherwise peaceful persons, CRESPO became separated from one of her friends.

226.     The police, with an overwhelming presence, established a very substantial police line at

16th & K Streets. The following photo depicts the police line at 11:42 and 29 seconds,

with command officials in white shirts in charge, one of whom is noted with a yellow

arrow.



227. After being driven out of the Plaza by police, CRESPO observed a music truck. Communicating by phone with her separated friend, they agreed to meet near the music truck which was an easily visible meeting location.

228. After reuniting, CRESPO and her friends decided it was time to leave. CRESPO did not observe any violent or physically aggressive behavior by protestors and did not engage in any unlawful or violent activities herself.

229. As far as CRESPO could observe, police had not ordered dispersal.

230. Standing outside of the Plaza, CRESPO heard no audible orders by police to depart the area. She heard no warning or orders at all by police.

231. There were no efforts to disperse the crowd from the area using warnings or orders with amplified sound.

232. At approximately 11:53 p.m., in a unified team action, several police officers can be seen on video running from positions behind the police line close to the white-shirted command staff. They simultaneously cast their arms back and overhand threw less lethal

weapons in a police attack on those peacefully assembled.



233.   Multiple devices explode within the midst of the peacefully assembled crowd. The flash of light in the image below depicts one of the first of multiple explosions of less lethal weapons.



234.   One of the munitions exploded in close proximity to CRESPO.

235.   Despite CRESPO wearing jeans, the force of the munition tore into the flesh on her leg.

236.   The pain, according to CRESPO, was so severe as to be practically indescribable.

237.   CRESPO's leg was burned, and her calf was squirting blood from two large open wounds.

238.   CRESPO had to be carried to a nearby van by protestors who were able to summon a volunteer medic to tend to CRESPO's injuries from the exploding less lethal weapons.

239.   CRESPO's friend had was also injured by the less lethal weapon and brought to the van for medical assistance.

240.   CRESPO's jeans had to be cut off of her. Two of the laceration wounds on the lower part of her leg are depicted below, after the wound had been cleaned by the volunteer medic.



241.   There were at least five additional wounds continuing up CRESPO's leg and thigh.

242.   There was no legal basis for the use of force.

243.   When the police line started advancing again, towards where the van was parked, CRESPO and the others got in and drove away to avoid another violent attack by the police.

244.   Once in the van, now after midnight, the volunteer medic advised the driver that they needed to go to the hospital because CRESPO was in need of immediate medical treatment.

245.   En route, at a stop light, a group of MPD bicycle officers surrounded and stopped the van and the officers ordered that the vehicle be turned off.

246.   They explained to the officers that they were en route to the hospital because CRESPO and her friend were both injured and needed immediate medical attention. The officers responded by demanding that they not only stay in car, but commanded the driver turn the vehicle's keys over to the officer, which he did.

247.   Unable to drive themselves to medical care, they had to wait another 60 – 90 minutes before an ambulance arrived at the scene.

248.   CRESPO was released from the emergency room that night on crutches and she remained confined to the crutches for a month to avoid further injury. CRESPO had to continue with ongoing medical treatment for the numerous lacerations and third degree burns down her right leg.

249.   Officers DOE 11 - 14 intentionally discharged their less lethal weapons with knowledge that it was indiscriminate and non-target specific, without concern or regard as to who was ultimately hit by the weapon.

250.    Officers DOE 11-14 discharged their weapons with knowledge that they were deployed into a lawful and peaceful assembly of persons engaged or associated with political protest engaged in protected First Amendment activities.

251.    Officers DOE 11-14 discharged their weapons knowing that they would strike CRESPO or other persons who, like CRESPO, had not violated any law, had not failed to comply with a lawful order, had received no warning and/or directive to clear the area, and were utterly vulnerable to wound or injury from the exploding weapons.

252.    On information and belief, the discharge of this indiscriminate weapon into an area within which were assembled persons engaged in non-criminal, non-violent political protest was authorized by a command official in the field at the scene, DOE 15.

253.    There were no circumstances that prevented or impaired MPD's command and control of its officers.

254.    At all times relevant to these allegations, the involved MPD officers were acting at and within the established control structure and chain-of-command of the MPD.

255.    As a direct and proximate result of these unlawful actions, CRESPO has sustained injury and damages including physical injury, mental anguish, distress, and pain and suffering.

256.    CRESPO submitted a notice of claim pursuant to D.C. Code §12-309 regarding this incident on December 8, 2020.

**EVENTS RELATED TO AUGUST 30-31, 2020 – ELIZABETH FERRIS**

257.    On August 30, 2020, a peaceful and non-violent march was announced to depart Black Lives Matter Plaza and the White House area at 9 p.m., protesting under the slogan, "Abolish the police."

258.    The march was called in the wake of the police shooting of Jacob Blake seven times,

including four bullets to his back, and the subsequent murder by Kyle Rittenhouse of three men at a racial justice protest.

259.   FERRIS was involved in the march both to associate with the underlying message opposing racist police brutality and also to report as independent media to raise awareness by live streaming and narrating events of political significance to an Internet-viewing audience.

260.   The march returned to BLM Plaza at approximately 11:30 p.m.

261.   Early on August 31, 2020, approximately 12:08 – 12:10 a.m., FERRIS was on or in the immediate vicinity of BLM Plaza near H Street, NW, along with other protestors with the march who had returned to the Plaza as a "safe gathering space."

262.   Protestors were milling in BLM Plaza, on the former roadway of 16th Street, that the District of Columbia government had conveyed actual and apparent consent for protestors to assemble upon for free expression and First Amendment activities.

263.   Outside of the view of FERRIS, MPD officers had amassed eastward on H Street, just around the corner from 16th Street and BLM Plaza.

264.   Law enforcement issued no orders to FERRIS or to protestors in her vicinity.

265.   No orders or commands from police were audible to FERRIS.

266.   A police presence towards the south side of the Plaza, near H Street, was apparent from the discharge of some sort of pyrotechnic devices. Smoke and gas was in the air from the south of where FERRIS was standing and wafted towards FERRIS impacting FERRIS burning her breathing passages and causing her to cough.

267.   Protestors chanted, "I can't breathe!"

268.   The street around FERRIS, which was closed to traffic, was filled with peaceful persons

moving about and mostly looking towards the south, towards the spectacle being created by the police.

269.   MPD officers moved from their position on H Street and turned up 16th Street, moving north upon BLM Plaza.

270.   The MPD shot into those assembled on BLM Plaza.

271.   Multiple apparent smoke or gas devices were shot landing in FERRIS' vicinity. She responded by turning and walking away from the police violence, moving north away from the police conflagration to the south end.

272.   FERRIS was located at the painted D.C. mural stars of BLM Plaza when one or more MPD officers, DOES 15-19, intentionally shot projectiles or sting ball grenades near or at FERRIS. On information and belief, this use of force was directed by a commanding official, DOE 20.

273.   FERRIS was hit by a projectile from the less lethal weapons.

274.   Just prior to being shot, FERRIS observed that there were still no instructions being given by MPD.

275.   The munition that hit FERRIS struck her in the right side of her torso just above her waistline.

276.   FERRIS cried out with anguish and in pain from the injury and impact.

277.   The MPD officers had as a team either intentionally shot indiscriminately into the group of those assembled, or knowingly launched inherently indiscriminate munitions into the group assembled on BLM Plaza, or both.

278.   As reflected in the following image, MPD officers continued moving upon BLM Plaza from the south. Officers continued shooting directly into BLM Plaza.



279. Command officials, identifiable by their white shirts, were present while officers shot into those assembled in the Plaza.

280. The weapon caused pain, contusion, bruising, and suffering. FERRIS and others were the undifferentiated objects of shots intentionally fired by the officers in the direction of those assembled in the Plaza. In the alternative, FERRIS was intentionally targeted to be shot with a rubber or foam bullet or other type of projectile weapon with no basis whatsoever for any use of force against her.

281. Officers DOE 16 - 19 intentionally discharged their weapons knowing it would strike FERRIS or other persons, all of whom, like FERRIS, were associated with protest activity and assembly in BLM Plaza, had not violated any law, had received no directive to clear the area, had not failed to comply with any directive, and were utterly defenseless.

282. A purpose of this use of indiscriminate force was to retaliate, chill the message, and deter further protests through infliction of pain against those protesting or associated with the anti-police brutality and/or defund the police protests because of the content of the

message.

283. A purpose of this use of force was to incapacitate those struck, to facilitate custodial false arrest.

284. A purpose of this use of force was to extinguish the First Amendment activity and assembly occurring in BLM Plaza.

285. Approximately two minutes after FERRIS was shot by the less lethal weapon use from the south end near H Street, police, including a unit on bicycles, rushed into BLM Plaza from the north at I Street to trap and indiscriminately arrest those present therein.

286. Police moved against persons lawfully assembled on BLM Plaza from both the north and the south end in an effort to box them in and unlawfully kettle and arrest persons present.

287. Police began tackling and assaulting persons present on BLM Plaza knowing there was no basis for seizure. White shirt MPD command officials were also present at the northern side of the police assault.

288. An officer ordered FERRIS to get on the ground in an effort to arrest her, aware he was without any lawful basis to stop or seize her. He then became distracted and engaged in the forcible arrest of another.

289. FERRIS walked away with her hands upraised to indicate peacefulness in the face of a police riot.

290. There was no probable cause to arrest FERRIS.

291. FERRIS had not committed, nor was there probable cause to believe she was committing any crime, including at the time she was shot.

292. There was no lawful basis to use force against FERRIS.

293. There was no lawful basis to seize or order FERRIS to the ground.

294.   Officers continued to use less lethal weapons, including large blasts of pepper spray, to restrain protestors from movement and seize them for arrest as well as to retaliate against the protestors for their expressive activity and inflict collective punishment upon those assembled on BLM Plaza.

295.   Police continued shooting munitions at peaceful protestors and press who were in the Plaza, many with their hands up.

296.   The police continued to advance north up 16th Street seizing BLM Plaza block by block from racial justice protestors, and intentionally shooting munitions at people indiscriminately, injuring and/or arresting people present.

297.   MPD's actions forced protestors to extinguish their First Amendment-protected activities and to evacuate the Plaza and tend to the wounded as many were injured by the police's brutal use of weaponry against them. The following image, taken on August 31, 2020, is an accurate depiction of the resultant injury to FERRIS:



298. As a direct and proximate result of these unlawful actions, FERRIS has sustained injury and damages including physical injury, mental anguish, distress, and pain and suffering.

299. FERRIS submitted a notice of claim pursuant to D.C. Code §12-309 regarding this incident on November 25, 2020.

**COUNT 1**
**CROWDER (MAY 30, 2020 INCIDENT) AGAINST THE DISTRICT OF COLUMBIA**
**VIOLATION OF FEDERALLY PROTECTED RIGHTS**
**FIRST AMENDMENT TO THE U.S. CONSTITUTION; FOURTH AMENDMENT TO**
**THE U.S. CONSTITUTION; 42 U.S.C. SEC. 1983**

300. The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

301. The District of Columbia maintained policies, practices and/or customs that both authorized and caused MPD officers to injure CROWDER with a less lethal weapon, as set forth herein and above.

302. By operation of these policies, practices and/or customs, the District of Columbia acted in retaliation against persons for engaging in First Amendment protected activities, including specifically CROWDER on May 31, 2020.

303. By operation of these policies, practices and/or customs, the District of Columbia violated CROWDER's right to be free from unreasonable seizures and subjected CROWDER to excessive use of force in violation of the Fourth Amendment to the U.S. Constitution.

304. CROWDER was thereby deprived of rights and immunities secured to her under the Constitution and laws of the United States, including those rights secured by the First and Fourth Amendment to the U.S. Constitution.

305. The afore-referenced policies were effected with deliberate indifference to the known or obvious consequences and without regard to the violations of constitutional rights. In

addition, and in the alternate, the District of Columbia failed to train or supervise its officers as to the circumstances or manner of use of less lethal weapons in the context of protest activity so as to avoid the near-certain injury to constitutionally protected rights.

**COUNT 2**
**CROWDER (MAY 30, 2020 INCIDENT) AGAINST DOES 1 – 5**
**VIOLATION OF FEDERALLY PROTECTED RIGHTS**
**FIRST AMENDMENT TO THE U.S. CONSTITUTION; FOURTH AMENDMENT TO THE U.S. CONSTITUTION; 42 U.S.C. SEC. 1983**

306.   The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

307.   Officer DOES  1 – 5 are jointly and severally liable for their actions taken in coordination and in concert.

308.   Officer DOES 1 – 4 violated the First and Fourth Amendment rights of CROWDER when they deployed less lethal weapons into the group of protestors, one of which directly impacted CROWDER.

309.   Commanding Officer DOE 5 violated the First and Fourth Amendment rights of CROWDER when they participated in, approved, authorized, and/or encouraged the deployment of less lethal weapons into the group of protestors, one of which directly impacted CROWDER.

310.   Officer DOES 1-5 acted with reckless or callous indifference to the federally protected rights of CROWDER.

**COUNT 3**
**CROWDER (MAY 30, 2020 INCIDENT) AGAINST DOE 1 AND THE DISTRICT OF COLUMBIA**
**NEGLIGENCE**

311.   The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

312.   The conduct of DOE 1, respecting the discharge of a less lethal weapon under the circumstances present herein, deviates from the applicable standard of care and

constitutes negligence as to both the circumstances and the manner under which such force may be used.

313. The District of Columbia is liable under the doctrine of *respondeat superior* for the negligence of its agent who acted within the scope of their employment as an MPD officer and on behalf of and in the interests of their employer.

**COUNT 4**
**FERRIS (MAY 31, 2020 INCIDENT) AGAINST THE DISTRICT OF COLUMBIA**
**VIOLATION OF FEDERALLY PROTECTED RIGHTS**
**FIRST AMENDMENT TO THE U.S. CONSTITUTION; FOURTH AMENDMENT TO THE U.S. CONSTITUTION; 42 U.S.C. SEC. 1983**

314. The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

315. The District of Columbia maintained policies, practices and/or customs that both authorized and caused MPD officers to injure FERRIS with a less lethal weapon, as set forth herein and above.

316. By operation of these policies, practices and/or customs, the District of Columbia acted in retaliation against persons for engaging in First Amendment protected activities, including specifically FERRIS on May 31, 2020.

317. By operation of these policies, practices and/or customs, the District of Columbia violated FERRIS' right to be free from unreasonable seizures and subjected FERRIS to excessive use of force in violation of the Fourth Amendment to the U.S. Constitution.

318. FERRIS was thereby deprived of rights and immunities secured to her under the Constitution and laws of the United States, including those rights secured by the First and Fourth Amendment to the U.S. Constitution.

319. The afore-referenced policies were effected with deliberate indifference to the known or obvious consequences and without regard to the violations of constitutional rights. In

addition, and in the alternative, the District of Columbia failed to train or supervise its officers as to the circumstances or manner of use of less lethal weapons in the context of protest activity so as to avoid the near-certain injury to constitutionally protected rights.

**COUNT 5**
**FERRIS (MAY 31, 2020 INCIDENT) AGAINST DOES 6 – 10**
**VIOLATION OF FEDERALLY PROTECTED RIGHTS**
**FIRST AMENDMENT TO THE U.S. CONSTITUTION; FOURTH AMENDMENT TO THE U.S. CONSTITUTION; 42 U.S.C. SEC. 1983**

320.　The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

321.　Officer DOES  6 – 10 are jointly and severally liable for their actions taken in coordination and in concert.

322.　Officer DOES 6 – 9 violated the First and Fourth Amendment rights of FERRIS when they deployed less lethal weapons into the group of protestors, one of which impacted FERRIS.

323.　Supervisory Officer DOE 10 violated the First and Fourth Amendment rights of FERRIS when they participated in, approved, authorized, and/or encouraged the deployment less lethal weapons into the group of protestors, one of which impacted FERRIS.

324.　Officer DOES 6-10 acted with reckless or callous indifference to the federally protected rights of FERRIS.

**COUNT 6**
**FERRIS (MAY 31, 2020 INCIDENT) AGAINST DOE 6 AND**
**THE DISTRICT OF COLUMBIA**
**NEGLIGENCE**

325.　The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

326.　The conduct of DOE 6 respecting the discharge of an indiscriminate less lethal weapon under the circumstances present herein, deviates from the applicable standard of care and constitutes negligence as to both the circumstances and the manner under which such

force may be used.

327. The District of Columbia is liable under the doctrine of *respondeat superior* for the negligence of the agent who acted within the scope of their employment as an MPD officer and on behalf of and in the interests of their employer.

## COUNT 7
## CRESPO (AUGUST 29/30, 2020 INCIDENT) AGAINST
## THE DISTRICT OF COLUMBIA
## VIOLATION OF FEDERALLY PROTECTED RIGHTS
## FIRST AMENDMENT TO THE U.S. CONSTITUTION; FOURTH AMENDMENT TO
## THE U.S. CONSTITUTION; 42 U.S.C. SEC. 1983

328. The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

329. The District of Columbia maintained policies, practices, and/or customs that both authorized and caused MPD officers to injure CRESPO with a less lethal weapon.

330. By operation of these policies, practices and/or customs, the District of Columbia acted in retaliation against persons for engaging in, or associating with those engaging in, First Amendment protected activities, including specifically CRESPO on August 29-30, 2020.

331. By operation of these policies, practices and/or customs, the District of Columbia violated CRESPO's right to be free from unreasonable seizures and subjected CRESPO to excessive use of force in violation of the Fourth Amendment to the U.S. Constitution.

332. CRESPO was thereby deprived of rights and immunities secured to her under the Constitution and laws of the United States, including those rights secured by the First and Fourth Amendments to the U.S. Constitution.

333. The afore-referenced policies were effected with deliberate indifference to the known or obvious consequences and without regard to the violations of constitutional rights. In addition and in the alternative, the District of Columbia failed to train or supervise its officers as to the circumstances or manner of use of less lethal weapons in the context of

protest activity so as to avoid the near-certain injury to constitutionally protected rights.

**COUNT 8**
**CRESPO (AUGUST 29/30, 2020 INCIDENT) AGAINST DOES 11-15**
**VIOLATION OF FEDERALLY PROTECTED RIGHTS**
**FIRST AMENDMENT TO THE U.S. CONSTITUTION; FOURTH AMENDMENT TO**
**THE U.S. CONSTITUTION; 42 U.S.C. SEC. 1983**

334.   The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

335.   Officer DOES  11 – 15 are jointly and severally liable for their actions taken in

coordination and in concert.

336.   Officer DOES 11 – 14 violated the First and Fourth Amendment rights of CRESPO when

they deployed less lethal weapons into the group of protestors, one of which impacted

CRESPO.

337.   Commanding Officer DOE 15 violated the First and Fourth Amendment rights of

CRESPO when they participated in, approved, authorized, and/or encouraged the

deployment of less lethal weapons into the group of protestors, one of which impacted

CRESPO.

338.   Officer DOES 11-15 acted with reckless or callous indifference to the federally protected

rights of CRESPO.

**COUNT 9**
**CRESPO (AUGUST 29/30, 2020 INCIDENT) AGAINST DOE 11 AND**
**THE DISTRICT OF COLUMBIA**
**NEGLIGENCE**

339.   The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

340.   The conduct of DOE 11 respecting the discharge of a less lethal weapon under the

circumstances present herein, deviates from the applicable standard of care and

constitutes negligence as to both the circumstances and the manner under which such

force may be used.

341. The District of Columbia is liable under the doctrine of *respondeat superior* for the negligence of its agent who acted within the scope of their employment as an MPD officer and on behalf of and in the interests of their employer.

**COUNT 10**
**FERRIS (AUGUST 30/31, 2020 INCIDENT) AGAINST THE DISTRICT OF COLUMBIA**
**VIOLATION OF FEDERALLY PROTECTED RIGHTS**
**FIRST AMENDMENT TO THE U.S. CONSTITUTION; FOURTH AMENDMENT TO**
**THE U.S. CONSTITUTION; 42 U.S.C. SEC. 1983**

342. The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

343. The District of Columbia maintained policies, practices and/or customs that both authorized and caused MPD officers to injure FERRIS with a less lethal weapon, as set forth herein and above.

344. By operation of these policies, practices and/or customs, the District of Columbia acted in retaliation against persons for engaging in First Amendment protected activities, including specifically FERRIS on or about August 31, 2020.

345. By operation of these policies, practices and/or customs, the District of Columbia violated FERRIS' right to be free from unreasonable seizures and subjected FERRIS to excessive use of force in violation of the Fourth Amendment to the U.S. Constitution.

346. FERRIS was thereby deprived of rights and immunities secured to her under the Constitution and laws of the United States, including those rights secured by the First and Fourth Amendments to the U.S. Constitution.

347. The afore-referenced policies were effected with deliberate indifference to the known or obvious consequences and without regard to the violations of constitutional rights. In addition, and in the alternative, the District of Columbia failed to train or supervise its officers as to the circumstances or manner of use of less lethal weapons in the context of

protest activity so as to avoid the near-certain injury to constitutionally protected rights.

## COUNT 11
### FERRIS (AUGUST 30/31, 2020 INCIDENT) AGAINST DOES 16 – 20
### VIOLATION OF FEDERALLY PROTECTED RIGHTS
### FIRST AMENDMENT TO THE U.S. CONSTITUTION; FOURTH AMENDMENT TO THE U.S. CONSTITUTION; 42 U.S.C. SEC. 1983

348.   The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

349.   Officer DOES  16 – 20 are jointly and severally liable for their actions taken in coordination and in concert.

350.   Officer DOES 16 – 19 violated the First and Fourth Amendment rights of FERRIS when they deployed less lethal weapons into the group of protestors, one of which impacted FERRIS.

351.   Commanding Officer DOE 20 violated the First and Fourth Amendment rights of FERRIS when they participated in, approved, authorized, and/or encouraged the deployment of less lethal weapons into the group of protestors, one of which impacted FERRIS.

352.   Officer DOES 16-20 acted with reckless or callous indifference to the federally protected rights of FERRIS.

## COUNT 12
### FERRIS (AUGUST 30/31, 2020 INCIDENT) AGAINST DOE 16 AND THE DISTRICT OF COLUMBIA
### NEGLIGENCE

353.   The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

354.   The conduct of DOE 16 respecting the discharge of an indiscriminate less lethal weapon under the circumstances present herein, deviates from the applicable standard of care and constitutes negligence as to both the circumstances and the manner under which such use of force may be used.

355.   The District of Columbia is liable under the doctrine of *respondeat superior* for the

negligence of its agent who acted within the scope of their employment as an MPD

officer and on behalf of and in the interests of their employer.

**COUNT 13**
**ALL PLAINTIFFS AGAINST THE DISTRICT OF COLUMBIA AND**
**CROWDER AGAINST DOES 1-5);**
**FERRIS AGAINST DOES 6-10;**
**CRESPO AGAINST DOES 11-15;**
**FERRIS AGAINST DOES 16-20**
**NEGLIGENCE PER SE – Violations of the First Amendment Assemblies Act of 2004**

356.   The averments in paragraphs 1 to 299 are incorporated by reference as if set forth herein.

357.   As set forth above, the use of less lethal projectile weapons was gratuitous or in

retaliation or collective punishment of those associated with protest. To the extent the

MPD were to assert a motivation was dispersal, plaintiff argues in addition and in the

alternative that use of less lethal weapons without prior amplified warning and orders to

disperse followed by opportunity to comply, constitutes negligence per se.

358.   For all events, the MPD did not have a lawful basis to issue a general order for dispersal.

D.C. Code § 5-331.07 (c), (d). Further, the D.C. Code establishes a standard of care to be

undertaken when the MPD disperses such an assembly. The First Amendment

Assemblies Act ("FAAA") was enacted to protect persons who exercise their First

Amendment rights. D.C. Code § 5-331.17.

359.   The FAAA mandates that "If and when the MPD determines that a First Amendment

assembly, or part thereof, should be dispersed, the MPD shall issue at least one clearly

audible and understandable order to disperse using an amplification system or device, and

shall provide the participants a reasonable and adequate time to disperse and a clear and

safe route for dispersal." D.C. Code § 5-331.07(e)(1). Defendants failed to give a

"clearly audible and understandable order to disperse using an amplification system or device" and failed to "provide the [Plaintiffs] a reasonable and adequate time to disperse and a clear and safe route for dispersal," in violation of the FAAA.

360.    The FAAA further dictates that, unless there is imminent danger of either personal injury of significant property damage, the MPD "shall issue multiple dispersal orders and, if appropriate, shall issue the orders from multiple locations. The orders shall inform persons of the route or routes by which they may disperse and shall state that refusal to disperse will subject them to arrest." D.C. Code § 5-331.07(e)(2).

361.    For all events, there was no imminent danger of injury to persons, no imminent danger of significant damage to property, and plaintiffs committed no acts of public disobedience endangering public safety and security. To the extent that the District claims that there were some other persons engaging in unlawful disorderly conduct or violence, the Defendants violated the FAAA in failing to control only those engaging in the unlawful conduct.

362.    Defendants failed to issue any warning or orders to disperse, let alone "issue multiple dispersal orders" to Plaintiffs, and did not inform the protestors of "the route or routes by which they may disperse," nor that their "refusal to disperse will subject them to arrest," in violation of the FAAA. D.C. Code § 5331.07(e)(2).

363.    Defendants failed to issue any warnings or orders to Plaintiffs prior to deploying the less lethal munitions.

364.    In the face of MPD's widespread violations of existing standards of care and rules calculated to retrain unlawful police conduct as to dispersal of First Amendment activities and the use of less lethal weapons, the Council of the District of Columbia enacted

emergency legislation to confirm its original intent that "less lethal projectiles shall not be used by MPD to disperse a First Amendment assembly." *See* D.C. Code § 5-331.16(c)(1).

365.   Upon information and belief, DOES 1-20 participated in the negligent conduct as alleged herein.

366.   Defendant District of Columbia is vicariously liable for DOE 1 – 20's negligence. At the time that Defendants engaged in the negligent conduct alleged herein, they were acting as agents of the District and within the scope of their employment as MPD officers.

367.   Defendants' violations of the FAAA constitute negligence per se causing Plaintiffs' injuries.

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.   A declaration that the acts described herein violated the First and Fourth Amendments to the United States Constitution;

B.   Damages compensating Plaintiffs for their injuries and damages, including for pain and suffering and any medical expense damages;

C.   An award of punitive damages against each individual DOE Defendant;

D.   An award of attorneys' fees and costs pursuant to 42 U.S.C. Sec. 1988; and

E.   An award of such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.


February 22, 2023                              Respectfully submitted,


                                               /s/ Mara Verheyden-Hilliard

Mara Verheyden-Hilliard (Bar # 450031)
mvh@justiceonline.org

/s/ Carl Messineo
Carl Messineo (Bar # 450033)
cm@justiceonline.org

/s/ Amanda Eubanks
Amanda Eubanks (Bar # 1630436)
(application pending)
ace@justiceonline.org

PARTNERSHIP FOR CIVIL JUSTICE
FUND, and its project
THE CENTER FOR PROTEST LAW &
LITIGATION
617 Florida Avenue, NW
Washington, D.C. 20001
(202) 232-1180
(202) 747-7747 (fax)


/s/ Michael Bruckheim
Michael Bruckheim [455192]
Bruckheim & Patel, LLC
401 East Jefferson Street
Suite 208
Rockville, MD 20850
(ph) 240-753-8222
(fax) 240-556-0300
(e-mail) michael@brucklaw.com

/s/ Sweta Patel
Sweta Patel [103010]
Bruckheim & Patel, LLC
1100 H Street NW, Ste 830
Washington, D.C. 20005
(ph) 202-930-3464
(fax) 240-556-0300
(e-mail) Patel@brucklaw.com