UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELIZABETH FERRIS**, *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:23-cv-00481-RCL** |
| **DISTRICT OF COLUMBIA**, *et al.***,** | |
| **Defendants.** | |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>

Plaintiffs Elizabeth Ferris, Hazie Crespo, and Katherine Crowder allege that they were peacefully protesting in the District on four separate days in May and August 2020 when officers of the Metropolitan Police Department (MPD) deployed less lethal munitions in their vicinity in violation of their First, Fourth, and Fifth Amendment rights.[1,2]  Plaintiffs also assert that the use of less lethal munitions was negligent under the circumstances; and because, as Plaintiffs contend, Defendants' actions were in violation of the District's First Amendment Assemblies Act (FAAA), they were negligent per se.  Plaintiffs' claims are without merit and should be dismissed.

First, Plaintiffs have failed to assert a retaliation claim under the First Amendment

---

[1]     While each Plaintiff's allegations concern a different date, time, and location, the substance of their allegations is the same.

[2]     Plaintiffs allege that Defendants Peter Newsham and Robert Glover were responsible for directing the actions of MPD officers in response to protests on the four days in question. Plaintiffs allege that on those days one or more of Defendants Anthony Alioto, Anthony Campanale, Stephen Chih, James Crisman, Justin Jordan, Michael Murphy, Gregory Rock, Nicholas Smith, Daniel Thau, Tara Tindall, and Eric Watson were responsible for actually deploying less lethal munitions.  Plaintiffs assert that Defendant District of Columbia (the District) is liable for the alleged constitutional violations.

Case 1:23-cv-00481-RCL   Document 22-1   Filed 05/19/23   Page 2 of 34

because they allege no facts showing that the use of less lethal munitions by the Individual Defendants[3] was caused by an improper motive. Plaintiffs merely speculate that because they were protesting police behavior (of all police officers everywhere) the deployment of less lethal munitions by MPD police officers in their vicinity was, ipso facto, motivated by the viewpoint they were expressing through their protest. But that type of rank speculation, absent any factual basis, does not state a claim, even at this early stage.

Second, Plaintiffs have failed to allege that they were illegally seized in violation of their Fourth Amendment rights because they never allege a seizure. To the contrary, Plaintiffs allege that the Individual Defendants deployed less lethal munitions to *disperse* the crowd of which they were a part, not to restrain the movement of Plaintiffs.

Third, Plaintiffs have failed to allege a violation of their Fifth Amendment procedural due process rights because they do not identify any liberty or property interest of which they were deprived without due process. Defendants are unaware of any authority for the proposition that individuals have a constitutionally protected right to notice and an opportunity to be heard before police officers deploy less lethal munitions, especially when police officers are making split second decisions during an active engagement.

Fourth, given Plaintiffs' allegations that the Individual Defendants intentionally injured them, they cannot rely on the same allegedly intentional tortious conduct to state a claim for negligence.

---

[3]    For ease of reference, Defendants use the term "Individual Defendants" when discussing the use of munitions generally during the four incidents raised in the Amended Complaint. However, in the context of each incident, "Individual Defendants" is meant to refer only to the officers actually alleged to have been involved in the specific events at issue; it is not meant to suggest that all Individual Defendants were involved in all events. When necessary, Defendants will refer specifically to the District or individually-named Defendants.

Fifth, Plaintiffs' allegation that Defendants violated the FAAA cannot support a claim for negligence per se. A negligence per se claim cannot be based on a statutory provision that, applied as a standard of care, would require the Court to determine whether a defendant appropriately exercised his discretion; rather, the underlying statute must provide the Court with specific criteria against which the Court can assess the defendant's alleged conduct. Here, the FAAA affords police officers significant discretion in the determination of when an activity is a First Amendment assembly and when a once peaceful protest has turned riotous.

Finally, even assuming Plaintiffs have alleged a bare violation of their Fourth and Fifth Amendment rights, those claims should still be dismissed as to the Individual Defendants because they are entitled to qualified immunity. And any constitutional claim against the District should be dismissed because Plaintiffs have failed to allege a viable theory of municipal liability.

For these reasons and those below, Plaintiffs' Amended Complaint should be dismissed with prejudice.

## BACKGROUND

### I.  May 29–June 1, 2020

On May 25, 2020, George Floyd died while in the custody of the Minneapolis police. His death sparked protests throughout the country. While many individuals protested peacefully, other individuals used the protests as an opportunity to engage in riotous acts, including violence and destruction.

For example, as reported by the Washington Post, on May 29, 2020, in the District, "protestors were throwing water bottles at a line of law enforcement," they "chased" a reporter while "screaming expletives at him," and they "tore out bricks from the sidewalk and smashed

3

them."[4]  On May 30, "protestors launched fireworks and threw bottles at the officers," "smashed

the facades of businesses with rocks and baseball bats," and "looted" an array of businesses.[5]  On

May 31, the looting, destruction of property, and attacks on police officers continued:

> … another night of mayhem …
>
> American flags and parked cars and buildings were lit ablaze—
> including St. John's Church.
>
> Downtown, baseball bats bashed through windows at coffee shops,
> banks and one office building after another. Vandals and looters
> roamed throughout the city, scrawling graffiti and targeting dozens
> of businesses well after the mayor's 11 p.m. curfew began.
>
> Some hit a liquor store near Foggy Bottom, where young men, both
> white and black, snatched handles of alcohol and took swigs while
> others ran off with all they could carry.  In Shaw, a Giant grocery
> store—with employees still inside—was broken into, as was a
> Sephora in Gallery Place. On H Street NE, looters ransacked a CVS.
> In Georgetown, the Nike store's boarded-up doors were broken
> down and its merchandise plundered. In Friendship Heights and
> Tenleytown, five miles from the White House, other groups hit a
> Target and smashed open Rodman's, a beloved drugstore, specialty
> grocer and housewares shop—all in one.[6]

In response to the violence, Mayor Muriel Bowser issued an order on June 1, 2020

imposing a city-wide curfew starting at 7:00 p.m.  *See* Mayor's Order No. 2020-069,

Continuation of District-wide Curfew during COVID-19 Public Emergency and Second Public

Emergency, 67 D.C. Reg. 6982–84 (June 5, 2020).  The Mayor explained why the curfew was

necessary:

---

[4]     Clarence Williams and Peter Hermann, *Demonstrations for George Floyd lead to clashes outside White House*, Wash. Post, May 29, 2020, at 1, 2020 WLNR 15094075.

[5]     Marissa J. Lang, *et al.*, *Tension between police and protestors flares in front of White House before vandalism and sporadic fires*, Wash. Post, May 30, 2020, at 1, 2020 WLNR 15150068.

[6]     Rebecca Tan, *et al.*, *Night of Destruction Across D.C. After Protestors Clash with Police Outside White House*, Wash. Post, May 31, 2020, at 1, 2020 WLNR 15211588.

In multiple areas throughout the District of Columbia, numerous businesses, vehicles, and government buildings have been vandalized, burned, or looted. More than eighty (80) individuals were arrested over the past two (2) days in connection with these incidents, with the majority charged with felonies.

On the night of May 31, 2020, looting and vandalism occurred at multiple locations throughout the city, in addition to the rioting in the downtown area. Vandals smashed windows in Northeast DC, upper Northwest DC stretching to Georgetown, and caused extensive damage in the Golden Triangle Business Improvement District, Downtown DC Business Improvement District, and Mount Vernon Triangle Community Improvement District. Rioting and looting affected the operations of the District government agencies.

The Mayor's concerns over what might happen that night were well-founded, as reported by the Washington Post:

Those who remained on the streets seemed more interested in looting than protesting. Around 10 p.m., they began smashing windows on New Jersey Avenue, along with Fourth and Seventh Streets. Chinatown businesses including Dunkin', Legal Seafood and [Bibipop] had windows destroyed. One man pried the boards off a CVS and dozens sprinted inside … . He emerged moments later with arms bulging with [merchandise].[7]

## II.   August 29–31, 2020

On Friday, August 28, 2020, thousands of people peacefully gathered to celebrate the anniversary of the March on Washington.  On the subsequent two days, many people protested peacefully throughout the District.  However, late in the evening on both August 29 and 30, 2020, what had been peaceful protest activity turned into violence and destruction.

As the Washington Post reported, on the night of August 29 near BLM Plaza, "demonstrators ignited fireworks, set small fires and threw projectiles including bricks, glass and

---

[7]    Rebecca Tan, *et al.*, *Before Trump vows to end 'lawlessness,' federal officers confront protestors outside White House*, Wash. Post, June 1, 2020, at 4, 2020 WLNR 15277344.

smoke grenades at officers in the area."[8]  Those individuals also "threw water bottles at officers." *Id*.  Similar activity occurred on August 30.[9]  After MPD officers attempted to stop the illegal activities, Mayor Bowser defended the actions of the officers, explaining that the recent confrontations between protestors and police were caused by "outside agitators" who came "armed for battle" and "looking for police to confront."  *Id*.

## III.   Plaintiffs' Complaint

Plaintiffs filed suit on February 22, 2023, against the District of Columbia and twenty unnamed officers.  *See* Compl. [1].  On April 28, 2023, Plaintiffs filed their Amended Complaint, replacing the unnamed officers with the thirteen Individual Defendants.  *See* Am. Compl. [16].  In total, Plaintiffs assert nine claims against the Individual Defendants and five claims against the District.  While based on distinct factual allegations, each Plaintiff alleges that Defendant Glover authorized the use of less lethal munitions pursuant to District policy and the directives of Defendant Newsham.  *Id*. ¶¶ 222, 298.  And each Plaintiff alleges that her First, Fourth, and Fifth Amendment rights were violated by the Individual Defendants, *e.g.*, *id.* ¶¶ 357–61, 389–93 (Ferris), and the District, *id.* ¶¶ 349–56, 389–93 (Ferris).  Each Plaintiff also claims that the use of the less lethal munitions was negligent, and that the District and Individual Defendants were negligent per se based on alleged violations of the FAAA.  *E.g., id.* ¶¶ 362–64, 394–409 (Ferris).

### A.   Elizabeth Ferris

Plaintiff Ferris's claims involve two separate incidents.  First, she alleges that, on May

---

[8]     Clarence Williams, *et al*., *Five arrested after protestors march through D.C., start small fires and engage in tense standoff with police*, Wash. Post, Aug. 30, 2020, at 1, 2020 WLNR 24379998.

[9]     Peter Hermann, *et al*., *D.C. mayor blames outsides "armed for battle" for days of clashes with police*, Wash. Post, Aug. 31, 2020, at 1, 2020 WLNR 24438920.

31, 2020, she was protesting at approximately 7:15 p.m. near the 1400 block of H Street, NW. Am. Compl. ¶¶ 177–80.  While protesting, she alleges she was struck with multiple projectiles. *Id.* ¶ 228.  She further alleges that Defendants Thau, Campanale, Chih, Crisman, Tindall, and Watson deployed less lethal munitions at that same approximate time and location.  *Id.* ¶ 210. Second, she alleges that she was protesting at BLM Plaza on the evening of August 30, 2020, into the following day, and that she was injured by a projectile from a less lethal weapon at approximately 12:08–12:20 a.m.  *Id.* ¶¶ 282, 286, 298.  She further alleges that Defendants Campanale, Jordan, Rock, and Smith deployed less lethal munitions at that same approximate time and location.  *Id.* ¶ 297.

## B.    Hazie Crespo

Plaintiff Crespo alleges she was protesting on August 29, 2020, at BLM Plaza, starting at approximately 11:30 p.m.  *Id.* ¶¶ 240–42.  She alleges that she was struck by a projectile from a less lethal munition at approximately 11:53 p.m.  *Id.* ¶¶ 254–57.  She further alleges that Defendants Alioto, Thau, Campanale, Crisman, Jordan, and Murphy deployed less lethal munitions at the same approximate time and place.  *Id.* ¶ 274.

## C.    Katherine Crowder

Plaintiff Crowder alleges she was protesting on May 30, 2020, at approximately 10:00 p.m., near the intersection of 17th Street and K Street, NW.  *Id.* ¶ 117.  While there, she alleges she was struck with shrapnel or projectiles.  *Id.* ¶ 131.  Plaintiff Crowder further alleges that Defendants Thau, Crisman, Rock, and Tindal deployed less lethal munitions at that same approximate time and place.  *Id.* ¶ 125.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In making this assessment, courts must accept *only* well-pleaded factual allegations; conclusory allegations and legal conclusions are not entitled to an assumption of veracity. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678–79.

## ARGUMENT

**I.** **Plaintiffs Have Failed To Allege That the Individual Defendants Violated Their First Amendment Rights (Counts 2, 5, 8, 11).**

Plaintiffs allege that the Individual Defendants deployed less lethal munitions against them in retaliation for their participation in protests in violation of their First Amendment rights. Am. Compl. ¶¶ 335, 343, 351–52, 359–60, 367–68, 375–76, 383–84, 391–92. To state a claim for retaliation, a plaintiff must plausibly allege (1) he or she "engaged in conduct protected under the First Amendment;" (2) the defendant took a retaliatory action "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again;" and (3) the existence of "a causal link between the exercise of a constitutional right and the adverse action taken against him or her." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).

To satisfy the third prong of the retaliation analysis, a plaintiff must not only allege that the defendant had an "improper motive," but also show "evidence of causation." *Daugherty v. Sheer*, 891 F.3d 386, 391 (D.C. Cir. 2018) (quoting *Crawford-El v. Britton*, 523 U.S. 574 (1998)); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must

cause the injury.") (emphasis omitted).  "The improper motive must be a but-for cause of the government action, 'meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'"  *Comm. on Ways & Means, United States House of Representatives v. United States Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022) (quoting *Nieves*, 139 S. Ct. at 1722).  Because Plaintiffs' allegations fail to establish any connection between their protest activity and the Individual Defendants' use of less lethal munitions, their First Amendment claims should be dismissed.

While Plaintiffs repeatedly assert that the Individual Defendants used less lethal munitions against them because of the content of their protest activity, Am. Compl. ¶¶ 47, 48, 65, 87, 89(b), 94, 145, 149, 213, 223, 276, 299, 312, 315, 327, they allege no facts to support that speculative claim.  *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  Plaintiffs merely assume that because (a) their alleged First Amendment activity concerned the behavior of police officers generally (but not MPD officers specifically) and (b) the Individual Defendants are police officers, then the decision to deploy less lethal munitions was, ipso facto, because of their protest activity.  But the "plausibility standard … asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678; *see also Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.").  Plaintiffs must allege specific facts to support their claim.  *See Twombly*, 550 U.S. at 555.  Here, they have failed to allege any facts suggesting that any Individual Defendant had any improper motive let alone that the improper motive caused the use of less lethal munitions.

9

Plaintiffs attempt to cure their failure to allege any facts showing causation by noting that the Individual Defendants did not deploy less lethal munitions against the general public, but only against the individuals present at the scene, *i.e.*, protestors.  *See, e.g.*, Am. Compl. ¶ 17. However, as Plaintiffs acknowledge, they protested for many hours in close proximity to MPD officers without any deployment of less lethal munitions, which directly contradicts their claim that their protest activity was the reason that the Individual Defendants deployed less lethal munitions.  *See, e.g.*, *id.* ¶¶ 116, 180, 282.

As Plaintiffs also acknowledge, District officials repeatedly identified misconduct by individuals present at these gatherings as the reason for the deployment of less lethal munitions. *See id.* ¶¶ 6, 13, 79, 80, 81, 107.  When a demonstration has been determined to have become violent, it "lose[s] [its] protected quality as expression under the First Amendment."  *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972); *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977) (explaining that "[i]t is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit").  While Plaintiffs argue that less lethal munitions deployed into a crowd "necessarily target[s] *all* protestors, not merely those who have engaged in some alleged misconduct," *see id.* ¶ 17, that claim only further undermines their failure to allege causation because it provides an alternative—and more reasonable—explanation for why MPD officers deployed less lethal munitions.  Accordingly, Plaintiffs cannot rely on their allegations that less lethal munitions will impact individuals beyond those engaging in alleged misconduct to plausibly allege that the Individual Defendants had a retaliatory motive for the use of less lethal weapons.

Because Plaintiffs have failed to allege any facts to plausibly show that retaliation was the but-for cause of the deployment of less lethal munitions on any of the dates at issue, Plaintiffs' First Amendment claims should be dismissed.  *See Daugherty*, 891 F.3d at 391.

## II.    Plaintiffs Have Failed To Allege That the Individual Defendants Violated Their Fourth Amendment Rights (Counts 2, 5, 8, 11).

Plaintiffs allege that the deployment of less lethal munitions in their vicinity constituted an unreasonable seizure as well as the use of excessive force in violation of their Fourth Amendment rights.  Am. Compl. ¶¶ 337, 343, 353, 359, 369, 385, 391.  Neither claim has merit.

A seizure requires significant, intentional governmental termination of freedom of movement.  *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998).  A seizure "does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even when there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*."  *Id.* (emphasis in original).

The Supreme Court recently considered when "[t]he application of physical force to the body of a person" is a seizure and emphasized that "[a] seizure requires the use of force *with intent to restrain*."  *Torres v. Madrid*, 141 S. Ct. 989, 994, 998 (2021) (emphasis in original).  "[F]orce intentionally applied for some other purpose" will not satisfy this rule.  *Id.* at 998; *see also United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) ("For purposes of a Fourth

11

Amendment a seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority" (internal quotation omitted)).[10]

*Logan v. City of Pullman*, 392 F. Supp. 2d 1246 (E.D. Wash. 2005), is instructive.  There, police officers were called to break up a large fight at a two-story club.  *Id*. at 1255–56.  The officers discharged pepper spray on the first floor with the intent of spraying the combatants, but the effects of the spray were felt by other individuals.  *Id*.  In assessing which individuals in the club were "seized," the court distinguished between individuals who were the intended targets of the officers' pepper spray and those who experienced secondary exposure.  *Id.* at 1260.  The court concluded that "since none of the Plaintiffs who suffered secondary exposure from the [pepper spray] on the first or second floor were the deliberate and intended object of the Defendants Officers' use of [pepper spray] they were not 'seized.'"  *Id*.

So too here.  At most, Plaintiffs have alleged that "some" law enforcement officers discharged less lethal munitions towards "some" protestors, but that is not enough to allege that they personally were seized under the Fourth Amendment by any Individual Defendant, especially when the exposure did not terminate their freedom of movement.

For example, Plaintiff Crowder contends that, on May 30, 2020, MPD dispersed less lethal weapons into the crowd and that she then fled the scene.  Am. Compl. ¶¶ 125, 133–35.  But she does not allege that MPD attempted to make any arrests related to this use of force and

---

[10]     *See, e.g., United States v. Scott*, Case No. 21-51084, 2022 U.S. App. LEXIS 32887, at *7 (5th Cir. Nov. 29, 2022) (per curiam) (holding appellant was not seized when officer grabbed his sweatshirt "with objective intent to move him out of the way of the apartment door—not to apprehend him"); *Pinto v. Collier Cnty.*, Case No. 21-13064, 2022 U.S. App. LEXIS 17453, at *10 n.7 (11th Cir. June 24, 2022) (holding that push that occurred before arrest was not a seizure because it was done "to separate [appellant] from the manager to prevent an escalation of [an] altercation" rather than to restrain"); *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (holding no seizure occurred when physical force was "intended to remove Plaintiff from his path" and officer "did not intend to acquire physical control over [appellant]").

the photographs included in the Complaint do not suggest that the photographed officers took any action to engage with the crowd after the purported deployment of munitions. Am. Compl. at 32–33. Similarly, Plaintiff Ferris does not allege that MPD made any attempts to arrest members of the crowd or prevent individuals from leaving the area after the purported deployment of less lethal weapons on May 31, 2020. *See* Am. Compl. ¶¶ 211–26, 229. And Plaintiff Crespo makes no allegations that MPD attempted to make arrests after the deployment of less lethal munitions or that MPD sought to prevent her from leaving the immediate area. Am. Compl. ¶¶ 252–65.[11] Even taking these allegations in the light most favorable to Plaintiffs, there is no suggestion that the deployment of less lethal munitions on these occasions was *for the purpose of* restraining Plaintiffs. *Cf. Jones v. District of Columbia*, Case No. 21-836, 2021 U.S. Dist. LEXIS 216137, at *14 (D.D.C. Nov. 9, 2021) (finding that alleged physical force was not a seizure because plaintiff's allegations "support an inference that [the officer] intended to harm, interfere, annoy or provoke" the plaintiff, but not an objective intent to restrain).

With regard to the August 2020 events, while Plaintiffs contend that facilitating custodial arrest was one of several purposes for which less lethal munitions were deployed, they do not plausibly allege that Plaintiff Ferris was seized during that incident. *See* Am. Compl. ¶¶ 315–17. Plaintiffs specifically allege that the use of force against Plaintiff Ferris "was intended to retaliate against, punish, silence, and deter her expressive activities." *Id.* ¶ 312. Although Plaintiffs assert that MPD made some arrests after the deployment of the less lethal munitions, *id.* ¶ 318,

---

[11]     Plaintiff Crespo pleads only that the use of less lethal munitions was a seizure. *See* Am. Compl. ¶¶ 366, 369, 336. To the extent she intends to allege that MPD seized her by stopping the vehicle she left the scene in, *see id.* ¶¶ 267–69, Plaintiff Crespo fails to plausibly allege facts indicating that any such seizure was constitutionally unreasonable. Plaintiff Crespo alleges only that MPD stopped the vehicle she was riding in, seized another individual's keys, and that she then had to wait for an ambulance, *see id.*; these threadbare allegations are not sufficient to state a Fourth Amendment claim.

Plaintiffs do not allege any force was used with the purpose of arresting Plaintiff Ferris.  Plaintiff Ferris does allege that one officer ordered her to the ground, *id.* ¶¶ 321–22, but she also alleges she walked away from that officer and then left the scene, which undermines any claim that the use of less lethal munitions was meant to restrain her movement.  *See Torres*, 141 S. Ct. at 998. ("[T]he appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain[.]").  And, to the extent Plaintiff Ferris is attempting to allege that her interaction with this officer was a seizure, Plaintiff Ferris does not plausibly allege that she "voluntarily submit[ted] to a show of authority" and, therefore, she has not plausibly alleged that she was seized.  *Cf. United States v. Veney*, 45 F.4th 403, 405–06 (D.C. Cir. 2022) (holding individual was not seized when ordered to stop because individual continued walking).

Even assuming Plaintiffs had alleged a seizure, to state a claim for the use of excessive force, the level of force used to effect the seizure must have been objectively unreasonable. *Robinson v. District of Columbia*, 736 F. Supp. 2d 254, 259 (D.D.C. 2010).  However, "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  It depends on the totality of the particular situation and must be "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."  *Id.*  "[A]n officer has the authority to use 'some degree of physical coercion or threat thereof' during the course of the arrest, and 'not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,' violates the Fourth Amendment."  *Rogala v. District of Columbia*, 161 F.3d 44, 55 (D.C. Cir. 1998) (quoting *Graham*, 490 U.S. at 395–97)).  "An officer will only be held liable if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions."  *Id.* at 54.

14

Here, Plaintiffs allege that the Individual Defendants were confronted with a large crowd in the context of a situation where MPD officers had recently and repeatedly faced violent attacks from protestors.  Plaintiffs allege that, in an attempt to disperse the crowd of which they were a part, the Individual Defendants deployed standard less lethal munitions for a limited and brief period.  Under those circumstances, the alleged use of less lethal munitions by the Individual Defendants was not objectively unreasonable.  *See, e.g., Oberwetter v. Hilliard*, 639 F.3d at 548, 555 (D.C. Cir. 2011) (finding no excessive force where the officer allegedly shoved the plaintiff against a pillar, and violently twisted her arm); *Rogala*, 161 F.3d at 54–55 (finding no excessive force where the officer allegedly pulled the plaintiff out of a car, bruised her arm, and hit her head against the car); *Martin v. Malhoyt*, 830 F.2d 237 262 (D.C. Cir. 1987) (finding no excessive force where the officer allegedly threw the plaintiff into a car, slammed the door on one of his legs, grabbed his arms and pulled them behind his back, and forced him to sit in a painful position in the case).

Because Plaintiffs have not plausibly alleged that they were seized or that any seizure was effected with unreasonable force, their Fourth Amendment claims should be dismissed.

**III.**   **Plaintiffs Have Failed To Allege That the Individual Defendants Violated Their Fifth Amendment Rights (Counts 2, 5, 8, 11).**

Plaintiffs contend that their procedural due process rights under the Fifth Amendment were violated because Defendants "fail[ed] to give fair notice of conduct that is forbidden or required, and [failed] to provide clear and intelligible, non-vague directives, as is required by the Fifth Amendment to the U.S. Constitution."  Am. Compl. ¶ 96.  "A claim for a procedural due process violation requires a showing that (1) an official has deprived the plaintiff (2) of liberty or property (3) without 'providing appropriate procedural protections.'"  *Avila v. Dailey*, 246 F. Supp. 3d 347, 361 (D.D.C. 2017) (quoting *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689

(D.C. Cir. 2009)).  Defendants are aware of no case finding that the failure to provide an announcement prior to the use of force is a procedural due process violation or requiring that procedural protections be put in place before force can be used by police during an active engagement—*i.e.*, Plaintiffs have failed to identify any liberty or property interest of which they have been allegedly deprived.

Even if Plaintiffs' Fifth Amendment claim was analyzed as an excessive force claim under the Fourth Amendment, it would still fail because, while the issue of "whether a warning is given is considered by some courts in determining if excessive force was used, it is not a dispositive factor."  *Lash v. Lemke*, 971 F. Supp. 2d 85, 97 (D.D.C. 2013).  A warning is not per se required before the use of force, even deadly force.  *See Scott v. Harris*, 550 U.S. 372, 382–83 (2007).  In fact, the D.C. Circuit has rejected the argument that a dispersal order is constitutionally required before every group arrest:  "If police have probable cause to believe that the group they are arresting is committing or has committed a crime, no more is necessary." *Carr v. District of Columbia*, 587 F.3d 401, 410 (D.C. Cir. 2009).  In *Carr*, the D.C. Circuit recognized that in a situation "in which officers have reason to believe that an entire crowd is engaged in or encouraging a riot," "officers may wish to quell a disruptive situation *and* arrest those responsible for it, but a dispersal order—even if effective, which is doubtful—would allow the putative rioters to escape."  *Id.*  That discussion concerning warnings and dispersal orders in no way suggests that a particular procedure is constitutionally required before force can be used.

Plaintiffs also contend that the use of less lethal munitions "without announcement or warning and without providing clear and intelligible directions utterly failed to provide protestors with due process and notice as to what an individual needed to do to avoid being subject to use of force."  Am. Compl. ¶ 76.  To the extent Plaintiffs are intending to invoke the fair notice

doctrine, it is inapposite.  As the Supreme Court has recognized, "[a] fundamental principle in

our legal system is that laws which regulate persons or entities must give fair notice of conduct

that is forbidden or required."  *FCC v. FOX TV Stations, Inc.*, 567 U.S. 239, 253 (2012).

"[C]larity in regulation is essential to the protections provided by the Due Process Clause of the

Fifth Amendment."  *Id.*  "The Due Process Clause protects individuals from laws that are so

vague that they cannot be understood with reasonable consistency—whether by the people who

must obey the law or the officials charged with applying it."  *Agnew*, 920 F.3d at 55; *see also*

*Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (applying fair notice doctrine to suspension

of reporter's White House press pass where available restrictions did not cover behavior at

issue).  Defendants are not aware of any instance of this doctrine being applied to an active and

ongoing police engagement.  Laws, regulations, and rules that provide prior notice to citizens are

of a different character than the communication between law enforcement and citizens during an

ongoing and active engagement.  Accordingly, Plaintiffs have not alleged any cognizable due

process claim.[12]

---

[12]     Plaintiffs also contend that "[t]he use of less lethal projectiles in lieu of warnings or
orders … is an unintelligible, vague, arbitrary, and punishing command as to what is permissible
or impermissible in the context of public fora free speech."  Am. Compl. ¶ 76.  To the extent
Plaintiffs intend to raise any substantive due process claims, they have not adequately identified
a substantive due process theory or put the District on notice of those claims.  *See* Fed. R. Civ. P.
8.  Regardless, any substantive due process claims would merge with Plaintiffs' other
constitutional claims.  "Where a particular Amendment 'provides an explicit source of
constitutional protection' against a particular sort of government behavior, 'that Amendment, not
the more generalized notion of substantive due process, must be the guide for analyzing these
claims.'"  *Albright v. Oliver*, 510 U.S. 266, 275 (1994) (quoting *Graham*, 490 U.S. at 395).

IV.   **Plaintiffs Have Failed To Allege Negligence (Counts 3, 6, 9, 12).**

Plaintiffs assert a negligence claim against the District based on the actions of the Individual Defendants and other unidentified officers.  Am. Compl. ¶¶ 347, 363, 379, 395. Under District of Columbia law, "[a] claim alleging the tort of negligence must show:  (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by that breach."  *Poola v. Howard Univ.*, 147 A.3d 267, 289 (D.C. 2016) (quoting *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011)).  "Intent and negligence are regarded as mutually exclusive grounds for liability."  *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 479 (D.C. Cir. 2019) (quoting *Harris v. U.S. Dep't of Veteran Affairs*, 776 F.3d 907, 916 (D.C. Cir. 2015)).  "[I]t is settled that a person cannot negligently commit an intentional tort."  *Sabir v. District of Columbia*, 755 A.2d 449, 452 (D.C. 2000).  Because Plaintiffs have only alleged intentional tortious conduct, Plaintiffs have failed to plausibly allege a negligence claim.

The D.C. Court of Appeals has repeatedly considered when negligence claims are available based on purported excessive use of force by police officers.  For example, in *Blair v. District of Columbia*, the Court affirmed a grant of summary judgment denying a negligence claim, explaining that "if, in a case involving the intentional use of force by police officers, a negligence count is to be submitted to a jury, that negligence must be [1] distinctly pled[,] [2] based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself[,] and [3] violative of a distinct standard of care."  190 A.3d 212, 224 (D.C. 2018) (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 708, 711 (D.C. 2003)). Plaintiffs here have not plausibly alleged any aspect of negligence apart from the use of force

itself; therefore, Plaintiffs have not met their burden, even at the pleading stage, to state a claim for negligence.

*Maddox v. Bano*, 422 A.2d 763 (D.C. 1980), is also instructive.  There, the plaintiff brought a negligence claim after the expiration of the statute of limitations for intentional torts and contended that he was injured when police officers acted negligently during his arrest.  *Id.* at 763.  There was "no dispute that the physical contact was intentional, and such intentional contact constitutes battery." *Id.* at 164.  Conclusory allegations that the arrest was effected "carelessly and negligently" was insufficient to raise "a cognizable claim of negligence." *Id.* Based on its consideration of the elements of the alleged offense, the Court of Appeals "conclude[d] that appellant's complaint ple[d] in substance a cause of action for assault, battery, false arrest, and nothing more" and the claim was thereby barred by the statute of limitations. *Id.* at 765.

The same analysis should apply here.  Plaintiffs contend that the conduct of MPD officers, "intentional or negligent, respecting the discharge of a less lethal weapon under the circumstances present herein, deviates from the applicable standard of care and constitutes negligence both as to the circumstances and the manner under which such force may be used." Am. Compl. ¶¶ 347, 363, 379, 395.  But, as explained above, intentional tortious conduct cannot be the basis of a negligence claim.  Regardless of the identification of these counts as negligence, in each incident described in the Complaint, Plaintiffs specifically allege that the deployment of less lethal munitions into the crowd was intentional. *Id.* ¶¶ 125, 147, 204, 210, 271, 308, 313. *See Blair*, 190 A.3d at 222 (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 707 (D.C. 2003)) ("[A] plaintiff cannot seek to recover by 'dressing up the substance' of one claim, here assault, in the 'garments' of another, here negligence.").  Plaintiffs have alleged only that they

were injured by the intentional deployment of less lethal munitions into the crowd; therefore, they have not adequately alleged a claim for negligence.

## V.   Plaintiffs Have Failed To Allege a Violation of the First Amendment Assemblies Act (Count 13).

Plaintiffs argue in the alternative that, if less lethal munitions were used for dispersal, Defendants failed to meet the requirements of the First Amendment Assemblies Act (FAAA) and were negligent per se.  Am. Compl. ¶¶ 398–409.  Plaintiffs contend that the FAAA establishes a standard of care that MPD must comply with when dispersing a First Amendment assembly.  *Id.* ¶ 400.  In the District of Columbia, violation of a statute "may constitute negligence *per se* only if the statute is meant to promote safety, if the plaintiff is a member of the class to be protected by the statute, and if the defendant is a person upon whom the statute imposes specific duties." *Ginsberg v. Granados*, 963 A.2d 1134, 1140 (D.C. 2009) (quoting *McCracken v. Walls-Kaufman*, 717 A.2d 346, 354 (D.C. 1998) (alteration omitted)).  "[A] statute or regulation offered to establish a standard for negligence *per se* purposes must not merely repeat the common law duty of reasonable care, but must set forth specific guidelines to govern behavior." *McNeil v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996) (internal quotation omitted); *see also Chadbourne v. Kappaz*, 779 A.2d 293, 296 (D.C. 2001).  If a statute provides actors with discretion, it cannot be the basis for negligence per se.  *See Night & Day Mgmt. v. Butler*, 101 A.3d 1033, 1040 (D.C. 2014).

Plaintiffs contend that provisions of the FAAA provide such specific guidelines.  Am. Compl. ¶¶ 400–07.  However, the FAAA only applies to policing First Amendment assemblies. A First Amendment assembly is a "demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views."  D.C. Code § 5-331.02(1).  Whether a gathering meets these criteria determines

20

whether the FAAA applies; thus, a police officer's determination about whether a gathering is a First Amendment assembly is a threshold determination. If, for example, a gathering is a "riot"—*i.e.*, "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons," D.C. Code § 22-1322—rather than a First Amendment assembly, then the FAAA would not apply. The definition of a First Amendment assembly does not contain the kind of specific criteria that would allow a fact finder to evaluate a police officer's determination about the nature of a gathering without consideration of the reasonable care standard and probable cause. Without such criteria to determine whether the statutory provisions apply, a cause of action for negligence per se arising out of the FAAA is not appropriate.

Furthermore, D.C. Code § 5-331.07(e)(1) provides that "[i]f and when the MPD determines that a First Amendment assembly, or part thereof, should be dispersed, the MPD shall issue at least one clearly audible and understandable order to disperse using an amplification system or device, and shall provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal." As Judge Amy Berman Jackson noted in an oral ruling on motions to dismiss in *Horse v. District of Columbia*, No. 17-cv-1216, and *Schultz v. District of Columbia*, 18-cv-0120, this provision "doesn't set forth the specific guidelines that would enable a fact finder to decide whether the statute has been violated without resorting to a reasonable care analysis." Defs.' Ex. 1 at 31:2–18. Whether a First Amendment assembly was appropriately dispersed and whether a reasonable and adequate time to disperse was provided require an analysis of the reasonable care standard. *Id.* at 31:9–18. The same analysis applies here.

Similarly, D.C. Code § 5-331.07(e)(2) provides that "[e]xcept where there is imminent danger of personal injury or significant damage to property, the MPD shall issue multiple dispersal orders from multiple locations.  The orders shall inform persons of the route or routes by which they may disperse and shall state that refusal to disperse will subject them to arrest." This provision begins with a threshold determination that is necessarily a question of discretion. Whether there is imminent danger of personal injury or significant damage to property is a judgment call; there are no standards in the statute that would provide guidance on how to make this determination other than a general reasonableness standard.  *Cf.* Defs.' Ex. 1 at 31:2–18.

Lastly, even if the Court finds that the FAAA can form the basis of a negligence per se claim, the claim asserted here should be dismissed against the Individual Defendants. Negligence per se is only available "if the defendant is a person upon whom the statute imposes specific duties."  *Ginsberg*, 963 A.2d at 1140 (internal quotation omitted); *see also McNeil*, 686 A.2d at 579 ("The statute must also 'impose specific duties on the defendant.'" (quoting *District of Columbia v. White*, 442 A.2d 163, 164 (D.C. 1982))).  The provisions of the FAAA at issue impose duties on MPD, not on any officer or any commanding officer.  D.C. Code § 5-331.07; *cf. White*, 442 A.2d at 163 n.12 & 164 (discussing that a statute prohibiting excessive force by "any officer" "specifically imposed a duty on [the officer]").  Because the FAAA does not impose specific duties on individual officers, Count 13 should, at a minimum, be dismissed as to the Individual Defendants.

## VI.    <u>The Individual Defendants Are Entitled to Qualified Immunity.</u>

The doctrine of qualified immunity protects individual government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*,

555 U.S. 223, 231 (2009).  The Supreme Court has "repeatedly stressed the importance of

resolving immunity questions at the earliest possible stage in litigation."  *Id.* (quoting *Hunter v.

Bryant*, 502 U.S. 224, 227 (1991)).  "'Clearly established' means that, at the time of the officer's

conduct, the law was 'sufficiently clear that every reasonable official would understand that what

he is doing' is unlawful."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "[E]xisting law must have placed the

constitutionality of the officer's conduct 'beyond debate.'"  *Id.* (quoting *Ashcroft*, 563 U.S. at

741).

   A.   **Any Alleged Violation of Plaintiffs' Fourth Amendment Rights Was Not
        Clearly Established.**

   As discussed above, the Supreme Court recently emphasized in *Torres* that a seizure

made with the use of force requires that the force be used with the intent to restrain.  *See* 141 S.

Ct. at 998; *see also Scott*, 2022 U.S. App. LEXIS 32887, at *7; *Pinto*, 2022 U.S. App. LEXIS

17453, at *10 n.7; *Clark*, 513 F.3d at 1222.  It is thus not clearly established that the use of less

lethal munitions under the circumstances alleged by Plaintiffs, *i.e.*, for purposes other than to

restrain movement, is a seizure for purposes of the Fourth Amendment.

   For example, in *Black Lives Matter D.C. v. Trump*, the court considered whether MPD

officers were entitled to qualified immunity where Plaintiffs alleged that they were seized when

officers "improperly *dispersed* the protestors."  544 F. Supp. 3d 15, 48 (D.D.C. 2021).  The court

found that the individual officers had qualified immunity because it was not clearly established

whether the use of tear gas to disperse a crowd constituted a seizure.  *Id.* at 49.  The same is true

here:  It is not clearly established whether the use of less lethal munitions for a purpose other

than intent to restrain is a Fourth Amendment violation.  And, as the Supreme Court has

repeatedly held, "the clearly established law must be 'particularized' to the facts of the case."

*White v. Pauly*, 580 U.S. 73, 79 (2017). Therefore, the Individual Defendants are entitled to qualified immunity from Plaintiffs' Fourth Amendment claims.

**B.    Any Alleged Violation of Plaintiffs' Fifth Amendment Rights Was Not Clearly Established.**

Even if Plaintiffs have plausibly alleged a violation of their procedural due process rights (they have not), the Individual Defendants are entitled to qualified immunity. As discussed above, Defendants are aware of no caselaw finding that individuals have a right to notice and an opportunity to be heard prior to police officers' use of force. To the contrary, the D.C. Circuit has recognized that mass arrests without dispersal orders may be appropriate in some instances. *Carr*, 587 F.3d at 410. At the very least, the holding in *Carr* creates uncertainty about whether dispersal orders are a constitutionally required procedure before the deployment of less lethal munitions. As a result, the Individual Defendants are entitled to qualified immunity from Plaintiffs' procedural due process claims.

**VII.    Plaintiffs Have Failed To Allege That the District Is Liable For Any Violation of Their Constitutional Rights (Counts 1, 4, 7, 10).**

To state a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must allege not only an underlying constitutional violation, but also that a municipal policy, custom, or practice caused the plaintiff's purported constitutional injury. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Bush v. District of Columbia*, 595 F.3d 384, 386 (D.C. Cir. 2010). The D.C. Circuit has identified four ways that a municipal policy can be shown: "(1) the municipality adopts a policy that itself violates the Constitution; (2) the unconstitutional action was taken by a policy maker within the government; (3) the employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware; or (4) the municipality knew or

should have known of a risk of constitutional violations, but showed deliberate indifference to that risk by failing to act." *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)); *see also Singletary v. District of Columbia*, 766 F.3d 66, 73 (D.C. Cir. 2014). Plaintiffs assert that the District is liable under each of these theories, Am. Compl. ¶¶ 334, 340, 350, 356, 366, 372, 382, 388, but fail to plausibly allege municipal liability under any of them.

A.   **Plaintiffs Have Failed To Identify Any Official Policy That Caused Any Violation of Their Constitutional Rights.**

Plaintiffs allege that the District's policies authorized and caused Individual Defendants to deploy less lethal weapons in violation of their First, Fourth, and Fifth Amendment rights. *See, e.g.*, Am. Compl. ¶ 334. But Plaintiffs fail to identify any policies directing or authorizing the deprivation of constitutional rights as required by this theory of municipal liability. *See Bryan Cnty.*, 520 U.S. at 406 (referring to this category as "involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights").

Plaintiffs point to MPD's Standard Operation Procedures (SOP)[13] 16-01, *see* Am. Compl. ¶¶ 43–44, but do not allege how this policy authorizes the deprivation of constitutional rights such that the policy was the "'moving force' behind the alleged constitutional violation." *Baker*, 326 F.3d at 1306 (quotation omitted in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). To the contrary, SOP 16-01 directs MPD officers to "use the minimum amount of

---

[13]    Plaintiffs make general references to "MPD Standard Operating Procedure in effect at the time of these events," Am. Compl. ¶ 43, and allude to this being the SOP "pertaining to 'handling First Amendment assemblies and mass demonstrations,'" Am. Compl. ¶ 26. The relevant SOP, which Plaintiffs reference and quote, is SOP-16-01 (Handling First Amendment Assemblies and Mass Demonstrations).

force that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control … ."  SOP-16-01 (Handling First Amendment Assemblies and Mass Demonstrations), Attachment E at 5.  The policy contemplates that, under some circumstances, less lethal munitions will be an appropriate use of force under this standard.  *See id.*  SOP 16-01 also recognizes the mandates of the FAAA of 2004, *see id.* at Attachment A, making clear that the District's policy is that "persons and groups have a right to organize and participate in peaceful First Amendment assembles … subject to reasonable restrictions designed to protect public safety, persons, and property, and to accommodate the interest of persons not participating in the assemblies … ."  D.C. Code § 5-331.03; *see also* SOP-16-01 at 2–3.  Thus, even drawing all reasonable inferences in favor of Plaintiffs, the explicit policies of the District in the FAAA as well as SOP 16-01 do not establish that the District has expressly adopted a policy which authorized or directed the Individual Defendants to violate the constitutional rights of protestors like Plaintiffs.

To the extent Plaintiffs intend to construe SOP 16-01 as a restriction on speech that chills protest activities and is motivated by the content of protestors' speech, *see* Am. Compl. ¶ 335, Plaintiffs are once again off the mark.  In a traditional public forum, the government may place "reasonable time, place, and manner restrictions on the exercise of free speech, so long as the restrictions are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication."  *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1527 (D.C. Cir. 1984).  MPD standard operating procedures apply to "all members carrying out the mission of MPD when interacting with demonstrations, rallies, marches, picket lines, or other similar gatherings conducted for the purpose of persons expressing their political, social, or religious views," SOP 16-01 at 2, and the same standards

apply regardless of the substantive message of any demonstration.  The standard operating procedures provide that, in the event individuals at a mass demonstration engage in unlawful conduct, MPD officers should use only "the minimum amount of force that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control, while protecting the lives of the members or others."  SOP-16-01, Attachment E at 5.  Plaintiffs have not alleged that alternative channels of communication were closed to them; Plaintiffs have only alleged that MPD took action to clear mass gatherings at a few isolated areas on specific days.  Therefore, Plaintiffs have not plausibly alleged that MPD's standard operating procedures are an unconstitutional restriction on First Amendment protests.

Plaintiffs also allege that "the lack of individualized use of force reports" at First Amendment Assemblies and mass demonstrations "sends a message to officers that they will not be held accountable for inappropriate or unsafe use."  Am. Compl. ¶ 90.  But this contention is purely speculative, *see id.* ¶ 91, and is not supported by the requirements of SOP 16-01.  SOP 16-01 does not eliminate use of force reporting, it simply creates alternate requirements for official-directed use of force during a mass demonstration.  SOP 16-01, Attachment L at 1.  Under those circumstances, the official must notify the incident commander, Command Information Center, and Joint Operations Command Center (JOCC) and complete the PD Form 901-m Assembly or Demonstration Reportable Force Report.  *See id.*; *see also* PD Form 901-m (providing space for the names of all members involved in the use of force to be reported).  SOP 16-01 also requires the Internal Affairs Bureau to assign a representative to the JOCC and, after the conclusion of the mass demonstration or civil disturbance, complete a use of force after-action report and submit it to the Chief of Police.  *Id.* at 3.  The extensive reporting and monitoring requirements in the referenced standard operating procedures do not support an

inference that the use of force at protests is not being reviewed.  As neither of the explicit policies identified by Plaintiffs direct officers to violate protestors' constitutional rights, Plaintiffs fail to plausibly allege an official policy theory of municipal liability.

**B.**     **Plaintiffs Have Failed To Identify Any Acts of an Official Policymaker That Caused Any Violation of Their Constitutional Rights.**

Plaintiffs also advance a theory of municipal liability based on the actions of Chief Newsham as a policymaker.  Am. Compl. ¶¶ 26, 98–110.  The actions of a policy maker only subject a municipality to Section 1983 liability if the policymaker exercises "final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue."  *McMillian v. Monroe Cnty*, 520 U.S. 781, 785 (1997) (internal quotations omitted) (quoting *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989)).  But Plaintiffs nowhere suggest more than a high-level involvement by Chief Newsham, nor do they allege that the specific actions of Chief Newsham as a policymaker— rather than the individual decisions and actions of MPD officers—caused the particular constitutional violations Plaintiffs allege.

Plaintiffs allege that Chief Newsham was in the JOCC or on the scene during the four alleged incidents, *see* Am. Compl. ¶¶ 102, 104, and that while in the JOCC, Chief Newsham was able to "monitor events throughout the District," *Id.* ¶ 102, and "commanded, supervised, and directed the actions of police in the field."  *Id*. ¶ 103.  While Plaintiffs contend that Chief Newsham "directed and/or authorized the use of less lethal projectile weapons," Am. Compl. ¶ 105, they do not allege that Chief Newsham specifically ordered and approved any specific action by the individual officers in the incidents at the issue.  To the contrary, Plaintiffs contend that the incident commander, Defendant Glover, "was responsible for implementing the District's policies and NEWSHAM's directives on the scene including by specifically

28

authorizing the use of projectile weapons by individual officers at each of the four events within this Complaint." *Id.*; *see also id.* ¶ 31.  Plaintiffs' allegations that the incident commander was responsible for implementing Chief Newsham's purported directives precludes any argument that Chief Newsham himself caused any purportedly unconstitutional actions.

Plaintiffs contend that Chief Newsham's approval of the use of force at issue came during his press conferences, media appearances, and a hearing of the Council of the District of Columbia (D.C. Council).  *See, e.g.*, *id.* ¶¶ 99–100, 107, 109–10.  Yet Plaintiffs cannot show that these comments approved or ratified the specific violations alleged by Plaintiffs, rather than communicating general approval of actions by MPD officers on the evenings in question.  Nor can Plaintiffs argue that Chief Newsham's comments, which explicitly discussed officers responding to illegal actions and disorder, *see id.* ¶¶ 107, 109, constitute a ratification of the behavior alleged in the Complaint.[14]  To the contrary, at the October 15, 2020 D.C. Council hearing Plaintiffs cite, *see id.* ¶ 110, Chief Newsham stated that less lethal munitions were only used by officers to protect themselves or to address unlawful behavior and that "[i]f a police officer did unnecessarily deploy munitions in a first amendment assembly, I would be the first one to say that person has no business being a police officer."[15]  Plaintiffs have not plausibly alleged that Chief Newsham's comments demonstrated approval of the conduct Plaintiffs allege.

---

[14]    For example, during the May 31, 2020 press conference Plaintiffs cite, *see* Am. Compl. ¶ 99, Mayor Bowser and Chief Newsham discuss multiple incidents on May 30, 2020, including multiple fires being set, rioters throwing incendiary devices and bricks at police officers, and businesses being looted, and Chief Newsham acknowledges that officers deployed OC spray and sting bombs in some instances.  *See* May 31, 2020 Press Conference, available at https://www.c-span.org/video/?472638-1/washington-dc-mayor-holds-news-conference.

[15]    *Public Hearing on B23-0723, the "Rioting Modernization Amendments Act of 2020," B23-0881, the "Internationally Banned Chemical Weapon Prohibition Amendment Act of 2020" and B23-0882, the "Comprehensive Policing and Justice Reform Amendment Act of 2020"*, D.C. Council Committee on the Judiciary & Public Safety (Oct. 15, 2020) at 8:09:00, available at https://dc.granicus.com/MediaPlayer.php?view_id=44&clip_id=5751.

Thus, to the extent that Plaintiffs' Section 1983 claims rest on a policy-maker theory of municipal liability, Counts 1, 4, 7, and 10 should be dismissed.

### C.   Plaintiffs Have Failed To Allege A Custom or Practice Caused Any Violation of Their Constitutional Rights.

Municipal liability under Section 1983 only attaches under a custom or practice theory when the practice is "'persistent and widespread,'" *Hurd*, 997 F.3d at 338 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)), and the custom is "so engrained that it amounted to a 'standard operating procedure' of which municipal policymakers must have been aware." *Id.* (quoting *Jett*, 491 U.S. at 737).  Here, Plaintiffs allege that "[p]olicymakers knew or should have known of the indiscriminate use of less lethal weapons … in such a manner as to violate protestors' constitutional rights."  *See* Am. Compl. ¶ 67.  But Plaintiffs' claims fall far short of plausibly alleging a persistent and widespread pattern of behavior sufficient to establish a custom.  *See Hurd*, 997 F.3d at 338.

Plaintiffs rely on an Office of Police Complaints report stemming from an investigation into use of force at the 2017 Presidential Inauguration, *see* Am. Compl. ¶ 68, but the report cannot bear the weight Plaintiffs put on it.  OPC observes in the report that "[t]hroughout most of the day's events at various locations OPC's overall impression is that MPD performed in a professional manner and effectively and lawfully balanced the interests of public safety with the right of free expression."  D.C. Office of Police Complaints, *OPC Monitoring of the Inauguration, January 20, 2017, Report and Recommendations of the Police Complaint Board to Mayor Muriel Bowser, the Council of the District of Columbia, and Interim Chief of Police Peter Newsham* at 2 (Feb. 27, 2017) (hereinafter OPC Report).  While the OPC Report discusses a few instances where it was concerned about the use of less lethal munitions, *see id.* at 4–5, 7–9, a few instances on one day are not sufficient to plausibly allege a persistent and widespread custom.

Plaintiffs also refer to the arrests of 234 people, "most with riot charges," seemingly in connection to an unidentified lawsuit against the District alleging that less lethal munitions were deployed based on a few acts of misconduct. *Id.* ¶ 69. But Plaintiffs do not provide any details about the use of force in that instance; they do not allege whether the less lethal munitions were deployed in retaliation, for the purposes of arrest, or whether a warning was given. And even if Plaintiffs had provided adequate detail about this incident, the events at a few protests on one day are insufficient to plausibly allege a widespread and persistent custom. *Cf. Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 93–94 (D.D.C. 2011) (finding that plaintiff did not state a claim for municipal liability where plaintiff offered only three examples and did not allege that "some, most, or all" individuals in similar circumstances experienced the alleged constitutional violation).

Nor does the OPC Report put the District on notice of less lethal munitions being used in retaliation for the content of speech or for purposes of facilitating arrest. *Cf.* OPC Report at 8 (discussing the use of less lethal munitions for crowd control). At most, the OPC Report states that "it appears certain provisions of the [First Amendment Assemblies] Act and Standard Operating Procedures for arrests at first amendment assemblies *may* not have been followed." *Id.* at 10 (emphasis added). Nothing in the OPC Report or Plaintiffs' bare-bones allegations about an unidentified lawsuit suggest a custom of using less lethal munitions to retaliate against or seize protestors. *Cf. Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014) (discussing that report concerning racial disparities in arrests had "no relevance" to allegations about a custom of violations of First and Fourth Amendment rights). In order to plausibly allege a custom theory of municipal liability, more is required.

**D.   Plaintiffs Have Failed To Allege Deliberate Indifference Caused Any Violation of Their Constitutional Rights.**

Nor have Plaintiffs plausibly alleged a theory of deliberate indifference based on an alleged failure to properly train, supervise, and discipline officers. *See* Am. Compl. ¶¶ 88–91. A failure to train gives rise to municipal liability where that failure "reflects a 'deliberate' or 'conscious' choice by a municipality." *Harris*, 489 U.S. at 398; *see also Dorman v. District of Columbia*, 888 F.2d 159, 165 (D.C. Cir. 1989) (holding that Section 1983 claim could not survive based on a failure to train where "there [was] no evidence of a *conscious choice or a policy* of deliberate indifference" (emphasis in original)). The deliberate indifference theory of municipal liability requires that Plaintiffs show that "[District] policymakers are on actual or constructive notice that a particular omission in their training program causes [District] employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61; *see also Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) ("Deliberate indifference … is determined by analyzing whether the [District] knew or should have known of the risk of constitutional violations but did not act." (internal citation and quotations omitted)). To meet this requirement, a plaintiff can show that "the frequency of constitutional violations makes the need for further training … plainly obvious to the city policymakers." *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996) (internal quotation marks omitted).

Here, Plaintiffs have not met their burden. Plaintiffs allege that District "[p]olicymakers knew or should have known of the indiscriminate use of less lethal weapons … in a manner as to violate protestors' constitutional rights." *See* Am. Compl. ¶ 67. But Plaintiffs only point to the OPC Report and allegations in an unidentified lawsuit, both concerning events on the day of the 2017 inauguration as support for this conclusion. *See* Am. Compl ¶¶ 67–69. Yet, as described above, the OPC Report only identifies a few instances where the OPC had concerns about the

use of less lethal munitions, and none of those instances involved the purportedly retaliatory use of less lethal munitions or the use of force to restrain civilians' movements.  *See* OPC Report at 8.  And Plaintiffs provide insufficient details about the allegations in the lawsuit mentioned to plausibly allege that it put the District on notice of the need for training on those issues.  *Hurd*, 997 F.3d at 339 (discussing that actual and constructive notice can be shown "by demonstrating a pattern of similar constitutional violations" (internal quotation omitted)).  "[D]eliberate indifference will not be found if the proffered pattern of conduct implicates different constitutional considerations."  *Id.*

Plaintiffs have also failed to allege that the District was "faced with actual or constructive knowledge that its agents will probably violate constitutional rights," and "adopt[ed] a policy of inaction."  *Warren*, 353 F.3d at 39 (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)).  As Plaintiffs note, the D.C. Council "enacted emergency legislation to restrict the use of less lethal weaponry, including limited proscriptions to prohibit the use of less lethal projectiles for the purpose of dispersing First Amendment assemblies."  Am. Compl. ¶ 84.  To the extent the District was on notice of concerns about the use of less lethal munitions, the D.C. Council took action to address those concerns.  Therefore, Plaintiffs have failed to plausibly allege deliberate indifference.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss and dismiss Plaintiffs' First Amended Complaint with prejudice.

Date: May 19, 2023.                                  Respectfully Submitted,

                                                     BRIAN L. SCHWALB
                                                     Attorney General for the District of Columbia

                                                     STEPHANIE E. LITOS

Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*

MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Helen M. Rave*

RICHARD P. SOBIECKI [500163]
HELEN M. RAVE [90003876]
MARCUS D. IRELAND [90005124]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7520
Email: helen.rave@dc.gov

*Counsel for Defendants*