**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELIZABETH FERRIS**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | Case No. 1:23-cv-481-RCL |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION

In response to the murder of George Floyd in the summer of 2020, protests swept the District of Columbia.  Four plaintiffs, who participated in these demonstrations, have filed this lawsuit against the District of Columbia and officers of the Metropolitan Police Department (MPD), including former Chief Peter Newsham, former Inspector Robert Glover, Sergeants Daniel Thau and Anthony Alioto, and Officers James Crisman, Anthony Campanale, Stephen Chih, Justin Jordan, Michael Murphy, Gregory Rock, Nicholas Smith, Tara Tindall, and Eric Watson (the "Individual Defendants").  Plaintiffs allege that MPD deployed harmful, indiscriminate "less lethal" munitions against peaceful protestors, in violation of their First, Fourth, and Fifth Amendment rights, and that both Individual Defendants and the District of Columbia are liable. They also claim the officers were negligent, and negligent per se based on violations of the District's First Amendment Assemblies Act (FAAA).

Defendants have moved to dismiss Plaintiffs' Amended Complaint.  The question at this stage is not the propriety of MPD's handling of protests that summer.  Instead, it is much narrower: Have these plaintiffs adequately pleaded their specific legal claims?  The Court concludes that Plaintiffs' First Amendment claims against the Individual Defendants and the District of Columbia may proceed.  But Plaintiffs have failed to adequately allege violations of their Fourth or Fifth

1

Amendment rights.  And while Plaintiffs' FAAA negligence per se claim survives, their negligence claims do not.

Accordingly, the Court will **GRANT** in part and **DENY** in part Defendants' Motion to Dismiss.

## I.   BACKGROUND

### A.  Factual Background

In deciding a motion to dismiss, the Court must "assume the truth of all material factual allegations in the complaint."  *See Am. Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  Although Defendants reference facts about police-related protests in the District during the summer of 2020, the Court will not consider that information at this stage.[1]

Plaintiffs' claims arise out of racial justice demonstrations that took place in the District in the summer of 2020 in response to the murder of George Floyd and other instances of police use of force.  Plaintiffs allege that in four separate incidents, MPD officers used force against peaceful protesters, including the Plaintiffs, inflicting injury and "extreme pain."  Amend. Compl., ECF No. 16, ¶ 3.  In particular, they allege that MPD "engaged in repressive and violent tactics including the authorized indiscriminate use of 'less lethal' projectile weapons against peaceful protestors and bystanders, gratuitously and without notice or warning to intentionally retaliate against and inflict pain upon protestors challenging policing in our society."  *Id.* ¶ 1.  Plaintiffs define a less lethal munition as "any munition that may cause bodily injury or death through the transfer of kinetic

---

[1] For example, the Defendants cite to Washington Post articles on violence by protestors, MTD at 3–4, and Mayor Muriel Bowser's explanation for imposing a city-wide curfew, MTD at 4–5.  In *Black Lives Matter D.C. v. Trump*, another Court in this District disclaimed reliance on newspaper articles and Mayor Bowser's factual findings because "they are not integral to the plaintiffs' claims."  544 F. Supp. 3d 15, 26 n.1 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023).  The same is true here.  *See also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice.").

energy and blunt force trauma, including rubber or foam-covered bullets, stun grenades and sting ball munitions." *Id.* ¶ 40.  Some less lethal munitions are inherently indiscriminate.  For instance, sting ball grenades launch hard rubber shrapnel toward people in all directions.  *Id.* ¶¶ 15–17.

Plaintiffs' claims center on four specific events during the summer of 2020.  Different sets of MPD officers were involved in the incidents, but in each case then-Inspector Robert Glover of MPD "authorized and directed the use of less lethal munitions against the respective crowds." Amend. Compl. ¶ 31.  And throughout the summer MPD's Chief of Police Peter Newsham "had full power, authority, and responsibility for the conduct, control, and discipline of the force," and "had full decision-making authority for the MPD's day-to-day strategic and tactical decisions." *Id.* ¶ 26; *see also* D.C. Code § 5-105.05 (2023) (providing that the Chief of Police is "invested with such powers and charged with such duties as is provided by existing law").  Plaintiffs allege that then-Chief Newsham "supervised, ordered, directed, authorized, and/or caused the violations alleged" in the Amended Complaint.  Amend. Compl. ¶ 26.  That is because "at each of the incidents" at issue, he "was in the command center or on the scene monitoring events and engaging in command supervision and directives," *id.* ¶ 104, and he "directed and/or authorized the use of less lethal projectile weapons and was responsible for the officers' response on the scene," *id.* ¶ 105.

Plaintiffs also allege that all four incidents "occurred as part of the standard practice or policy of the MPD of using unwarranted, excessive, unconstitutional force against individuals exercising their First Amendment rights to stand against police violence." *Id.* ¶ 8.  In particular, Plaintiffs allege that MPD' express policy authorized the use of less lethal weapons against groups including peaceful protestors without audible warnings or orders to disperse and even in the absence of any violence.  *Id.* ¶¶ 72–83.  Indeed, Plaintiffs cite a report by the District of Columbia

Office of Police Complaints examined MPD's response to protests in 2017 and found MPD's standard operating procedure "permits the use of less than lethal weapons at First Amendment assemblies" but "is silent as to whether a warning is required in advance of deploying a less than lethal weapon." *Id.* ¶ 68.  As a result, less lethal weapons "appeared to be deployed as a means of crowd control, and not necessarily in response to an unlawful action." *Id.*

The Court will recount each incident in turn.

### (i) *Katherine Crowder: May 30, 2020*

Katherine Crowder came to Washington, D.C. on May 30, 2020 to participate in protests "demanding an end to racist police violence."  Amend. Compl. ¶ 111.  Around 10:00 PM, Ms. Crowder and fellow protesters came upon a line of MPD officers.  *Id.* ¶ 117.  Ms. Crowder reprimanded an MPD officer she had witnessed pepper spraying a protestor.  *Id.* ¶¶ 121–23. Moments later, Sergeant Thau and Officers Crisman, Rock, and Tindall intentionally discharged less lethal weapons into the peaceful crowd.  *Id.* ¶ 125.  An unknown less lethal device exploded near Ms. Crowder, ejecting shrapnel or projectiles that cut and bruised her elbow.  *Id.* ¶¶ 125–31, 151.  As Ms. Crowder began to flee, another unknown device exploded near her.  *Id.* ¶¶ 134–35. Ms. Crowder had been "non-threatening and peaceful and did not engage in any destructive activity." *Id.* ¶ 141.  According to the Amended Complaint, "[n]o orders or directives were issued to" Ms. Crowder and she was "given no warning or notice that munitions were about to be deployed at or near her."  *Id.* ¶¶ 136–40.

### (ii)  Elizabeth Ferris: May 31, 2020

Elizabeth Ferris attended a peaceful march near Lafayette Park on May 31, 2020.  Amend. Compl. ¶¶ 177–83.  A line of MPD officers eventually blocked the crowd's progress.  *Id.* ¶ 188. "Without warning, notice, or justification," the officers confronted the protestors, with teams discharging indiscriminate sting ball munitions into the crowd.  *Id.* ¶¶ 198–204, 215.  Sergeant Thau and Officers Campanale, Chih, Crisman, Tindall, and Watson intentionally deployed a less lethal munition that exploded near Ms. Ferris.  *Id.* ¶ 210.  The munition sent projectiles flying.  At least nine struck Ms. Ferris in the leg, causing pain, disorientation, and difficulty walking.  *Id.* ¶¶ 214, 228, 229.  MPD "issued no directives" or warning to Ms. Ferris.  *Id.* ¶¶ 207–11.

### (iii)  Hazie Crespo: August 29, 2020

On August 29, 2020, Hazie Crespo accompanied friends to a protest at "Black Lives Matter Plaza" (BLM Plaza), a stretch of 16th Street N.W. the District had set aside as a safe space for assembly and protest.  Amend. Compl. ¶¶ 233–34, 239.  Ms. Crespo had been given no directives from police or warning when Sergeants Alioto and Thau, and Officers Campanale, Crisman, Jordan, and Murphy launched sting ball munitions into the peaceful crowd.  *Id.* ¶¶ 249–54, 271. One device exploded near Ms. Crespo, burning and wounding her leg.  *Id.* ¶¶ 256–59.  Ms. Crespo had received "no directive as to what she should do to avoid being subject to force" and "no warning or notice that munitions were about to be deployed at or near her."  *Id.* ¶¶ 252–53.

### (iv)  Elizabeth Ferris: August 30–31, 2020

On August 30, Ms. Ferris participated in another protest, joining a march to "[a]bolish the police."  Amend. Compl. ¶¶ 282–83.  By the early hours of August 31, Ms. Ferris and other protestors had ended up around BLM Plaza.  *Id.* ¶ 286.  Without issuing orders to Ms. Ferris or others in her vicinity, MPD officers launched smoke or gas devices into the crowd, causing Ms.

Ferris to retreat from the police. *Id.* ¶¶ 289, 296. As she was doing so, Officers Campanale, Jordan, Rock, and Smith intentionally launched projectiles or sting ball grenades at or near Ms. Ferris, hitting her and causing injury and pain. *Id.* ¶¶ 297, 301, 307. Ms. Ferris was "given no directive as to what she should do to avoid being subject to force" and "was given no warning or notice that munitions were about to be deployed at or near her." *Id.* ¶¶ 304–05.

### B. Procedural Background

Plaintiffs brought suit in this Court against the District of Columbia and the Individual Defendants on February 22, 2023. *See* Compl., ECF No. 1. On April 28, 2023, they filed an Amended Complaint. *See* Amend. Compl. The Amended Complaint alleges thirteen counts: a 42 U.S.C. § 1983 claim by Ms. Crowder against the District of Columbia for violation of Ms. Crowder's First Amendment rights by unconstitutionally restricting and chilling First Amendment-protected activities and retaliating against her for engaging in protected activities, violation of her Fourth Amendment right to be free from unreasonable seizures and excessive use of force, and violation of her Fifth Amendment right to due process (Count One); a 42 U.S.C. § 1983 claim by Ms. Crowder against Defendants Crisman, Glover, Newsham, Rock, Thau, and Tindall for violation of the same constitutional rights (Count Two); a claim by Ms. Crowder against the District of Columbia for negligence (Count Three); a 42 U.S.C. § 1983 claim by Ms. Ferris against the District of Columbia for violation of the same constitutional rights, stemming from the May, 2020 incident (Count Four); a 42 U.S.C. § 1983 claim by Ms. Ferris against Defendants Campanale, Chih, Crisman, Glover, Newsham, Thau, Tindall, and Watson for violation of the same constitutional rights, stemming from the May, 2020 incident (Count Five); a claim by Ms. Ferris against the District of Columbia for negligence, stemming from the May, 2020 incident (Count Six); a 42 U.S.C. § 1983 claim by Ms. Crespo against the District of Columbia for violation

of the same constitutional rights (Count Seven); a 42 U.S.C. § 1983 claim by Ms. Crespo against

Defendants Alioto, Campanale, Crisman, Glover, Jordan, Murphy, Newsham, and Thau for

violation of the same constitutional rights (Count Eight); a claim by Ms. Crespo against the District

of Columbia for negligence (Count Nine); a 42 U.S.C. § 1983 claim by Ms. Ferris against the

District of Columbia for violation of the same constitutional rights, stemming from the August,

2020 incident (Count Ten); a 42 U.S.C. § 1983 claim by Ms. Ferris against Defendants Campanale,

Glover, Jordan, Newsham, Rock, and Smith for violation of the same constitutional rights,

stemming from the August, 2020 incident (Count Eleven); a claim by Ms. Ferris against the

District of Columbia for negligence, stemming from the August, 2020 incident (Count Twelve);

and a claim by all Plaintiffs against all Individual Defendants and the District of Columbia for

negligence per se based on violation of the FAAA (Count Thirteen).

Defendants filed a Motion to Dismiss the Amended Complaint.  *See* MTD, ECF No. 22.

Plaintiffs opposed.  *See* Pls.' Opp'n, ECF No. 24.  Defendants then filed a reply.  *See* Defs.' Reply,

ECF No. 27.

Defendants' motion is now ripe for review.

## II.    LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's

complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the plaintiff has pleaded

facts sufficient to permit the Court to reasonably infer defendant's liability for the alleged

misconduct.  *Id.*   Plausibility is more than "sheer possibility," but not necessarily the same as

probability.  *Id.*  The plaintiff's factual allegations "must be presumed true and should be liberally

construed in his or her favor."  *Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 271 (D.D.C. 2011).

However, the Court need not accept as true legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. And while a complaint need not tender "detailed factual allegations," it must do more than offer "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## III.   DISCUSSION

The Court will consider whether Plaintiffs have adequately alleged that the Individual Defendants violated their constitutional rights, whether the District of Columbia is liable as a municipality for those violations, whether the Individual Defendants were negligent, and whether the Individual Defendants were negligent per se based on violations of the FAAA. The Court holds that Plaintiffs have adequately alleged their First Amendment claims against the Individual Defendants, but have failed to allege violations of clearly established Fourth or Fifth Amendment rights. It further holds that they have alleged their First Amendment claims against the District of Columbia, but not the Fourth or Fifth Amendment claims. The Court next holds that Plaintiffs have failed to allege negligence, but that they have adequately pleaded negligence per se.

### A.   Plaintiffs Have Adequately Alleged First Amendment Claims Against the Individual Defendants, but Not Fourth or Fifth Amendment Claims (Counts 2, 5, 8, 11)

42 U.S.C. § 1983 protects individuals against "the deprivation" by state officials "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It permits any "citizen" or "other person" to sue for damages "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia" was responsible for those violations. *Id.* Plaintiffs have sued the Individual Defendants under Section 1983 for violations of their rights under the First, Fourth, and Fifth Amendments. For the reasons discussed below, the Court concludes that Plaintiffs adequately alleged their First

Amendment claims against the Individual Defendants.   However, they have not adequately pleaded their Fourth or Fifth Amendment claims, which must be dismissed.

### 1.   Plaintiffs Have Stated Claims Under the First Amendment

Plaintiffs have adequately alleged two types of First Amendment claims against the Individual Defendants: that MPD officers deployed less lethal munitions to retaliate against the Plaintiffs' exercise of their First Amendment rights and that in discharging these munitions the officers unconstitutionally abridged the Plaintiffs' freedom of expression.

*(i)  Plaintiffs Have Adequately Pleaded First Amendment Retaliation*

The Plaintiffs have sufficiently alleged facts supporting an inference that retaliation against protestors for their police-critical message motivated the officers' deployment of less lethal munitions.

Plaintiffs assert that each time MPD officers subjected them to less lethal munitions, a "motivation" was to "intentionally retaliate against and inflict pain upon protestors" for First Amendment-protected activities, namely assembling and expressing views critical of the police. *See* Amend. Compl. ¶¶ 1, 47–48, 87; *see also id.* ¶ 145 ("The use of force against [Ms. Crowder] was intended to retaliate against, punish, silence, and deter her expressive activities."); *id.* ¶¶ 213, 312 (alleging the same concerning both incidents involving Ms. Ferris); *id.* ¶ 276 (alleging less lethal munitions were deployed against Ms. Crespo for a retaliatory motive).

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  To prevail on a First Amendment retaliation claim, a plaintiff must show: (1) he or she "engaged in conduct protected under the First Amendment;" (2) "the defendant took some retaliatory action

sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again;" and (3) there is "a causal link between the exercise of a constitutional right and the adverse action taken against him" or her.  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).  Defendants do not dispute that Plaintiffs have satisfied the first two prongs, *see* MTD at 8–11, but instead argue that Plaintiffs "have failed to allege any facts suggesting that any Individual Defendant had any improper motive let alone that the improper motive caused the use of less lethal munitions."  *See* MTD at 9.

To establish the causal link, a plaintiff must allege both "evidence of causation" and "proof of an improper motive."  *See Daugherty v. Sheer*, 891 F.3d 386, 391 (D.C. Cir. 2018) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998)).  In particular, the retaliatory motive must be the "but-for" cause of the injury, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Comm. on Ways & Means, United States House of Representatives v. United States Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022) (quoting *Nieves*, 139 S. Ct. at 1722).

At this stage, Plaintiffs need not offer direct evidence of retaliatory animus.  *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46–47 (D.D.C. 2021) (Friedrich, J.) ("Of course, direct evidence of retaliatory animus is not required, especially at this early stage of the proceedings."), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023); *Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 174 (D.D.C. 2022).  They need only allege facts giving rise to a *plausible* inference that in all four incidents MPD officers had a motive of retaliating against Plaintiffs for their criticisms of police and would have not deployed less lethal munitions against Plaintiffs were it not for this motive.  Here, Defendants contend that Plaintiffs' claim is merely "speculative."  *See* MTD at 9.  But Plaintiffs support this inference by asserting that

protestors engaged in anti-police messaging, *see* Amend. Compl. ¶¶ 4, 12, 17, 47, 111, 114, 178, 192, in two of the incidents directing such messaging at the officers on the scene, *see* ¶¶ 121–24, 191–92. Pls.'s Opp'n at 9. They further argue that causation may be inferred from the "indiscriminate nature" of the less lethal munitions used, and their use against peaceful protestors who were not ordered to disperse. *See id.* at 10, 12.

Plaintiffs have met their burden. For one thing, the "temporal proximity" between their First Amendment-protected protesting and the actions of the police supports an inference of causation. *See Goodwin*, 579 F. Supp. 3d at 175; *see also Black Lives Matter D.C.*, 544 F. Supp. 3d at 47 ("Causation may be inferred—especially at the pleading stage—when the retaliatory act follows close on the heels of the protected activity." (quoting *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015))). Importantly, each incident occurred at protests that Plaintiffs allege were entirely peaceful. *See* Amend. Compl. ¶¶ 119, 141, 219, 254, 272, 328.[2] If MPD discharged less lethal munitions despite facing only peaceful protestors and no violent rioters, unlike in *Iqbal* there is no "obvious alternative explanation" for the Defendants' actions other than an improper motive. *See Iqbal*, 556 U.S. at 682 (explaining that plaintiffs' inference of discriminatory intent was not plausible when an "obvious alternative explanation" existed) (quoting *Twombly*, 550 U.S. at 567). Plaintiffs have thus plausibly alleged retaliation in violation of the First Amendment.

In a different case, the Court might next consider whether the Individual Defendants are entitled to qualified immunity on the First Amendment retaliation claims. However, qualified immunity "is an affirmative defense that must be pleaded by a defendant official." *Harlow v.*

___

[2] Plaintiffs acknowledge District officials' allegations that some individuals present at protests engaged in unlawful activity. *See* Amend. Compl. ¶¶ 6, 13, 79–81, 107. But the Plaintiffs have not alleged that unlawful activity *actually* occurred at any of the protests in question, and at this stage the Court must proceed on the basis of the Plaintiffs' allegations.

*Fitzgerald*, 457 U.S. 800, 815 (1982).   Defendants have not raised a qualified immunity defense for either of the First Amendment claims.   *See* MTD at 3 (arguing that the Plaintiffs' Fourth and Fifth Amendment claims should be dismissed on the basis of qualified immunity, but not mentioning the First Amendment claims).   Therefore, at this stage the Court will not consider the availability of qualified immunity for either First Amendment theory.

> *(ii) Plaintiffs Have Adequately Pleaded Claims for Abridgement of Freedom of Speech in Violation of the First Amendment*

Taking the Plaintiff's allegations as true, they have sufficiently alleged that MPD officers abridged their First Amendment right to freedom of speech.

Plaintiffs claim that MPD's use of less lethal munitions against peaceful protestors without first giving a warning or order abridged their right to freedom of speech.   *See* Amend. Compl. ¶¶ 9, 89, 93, 317, 330, 343, 359, 375, 391.   They argue that their protest activities were core political speech, their speech occurred in traditional public fora, and the police deployment of less lethal munitions amounted to an unconstitutional content-based restriction on speech.   Pls.'s Opp'n at 13–17.   Defendants disagree, contending that the use of less lethal munition was a reasonable time, place, or manner restriction on speech because it was narrowly tailored to further "the Individual Defendants' substantial interest in controlling an incident or person to protect the lives of officers or the public."   Defs.' Reply at 6–7.

A court considering a claim under the Free Speech Clause of the First Amendment proceeds in three steps.   *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 514 (D.C. Cir. 2010).   First, the court "must . . . decide whether [the activity at issue] is speech protected by the First Amendment."   *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)) (alterations in the original).   "Second, assuming the activity 'is protected speech, we must identify the nature of the forum, because the extent to which the Government may limit access

depends on whether the forum is public or nonpublic.'" *Id.* (quoting *Cornelius*, 473 U.S. at 797). Third, the court "must assess whether the government's justifications for restricting speech in the relevant forum 'satisfy the requisite standard.'" *Id.* (quoting *Cornelius*, 473 U.S. at 797).

To begin with, the Plaintiffs were engaged in First Amendment-protected activity. It is axiomatic that "[p]rotest, picketing, and other like activities lie at the core of free speech guaranteed by the First Amendment." *Terry v. Reno*, 101 F.3d 1412, 1421–22 (D.C. Cir. 1996). Here, the First Amendment protected Plaintiffs' passionate but peaceful protesting of police practices. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) (noting that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers").

Next, at the time MPD officers deployed less lethal munitions against the Plaintiffs, the Plaintiffs were in traditional public fora. As the Supreme Court has explained, "traditional public fora are areas that have historically been open to the public for speech activities," including "public streets and sidewalks." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). The protests took place on the streets and sidewalks of Washington, D.C., including BLM Plaza. *See* Amend. Compl. ¶¶ 114–17, 188, 246, 293–95. In such places, "the government's ability to permissibly restrict expressive conduct is very limited." *Hodge v. Talkin*, 799 F.3d 1145, 1149 (D.C. Cir. 2015) (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)). In a public forum, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293

(1984)).    However, in a traditional public forum such as the District's streets or sidewalks, government "restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). Thus "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

Here, taking Plaintiffs' allegations as true, MPD's deployment of less lethal munitions against peaceful protestors was not a permissible time, place, or manner restriction because it amounted to a content-based restriction that cannot satisfy strict scrutiny.[3]   As discussed above, Plaintiffs have sufficiently alleged facts supporting an inference that in using less lethal munitions against protestors, MPD officers were motivated by animus against the protestors based on their police-critical message.   It follows, then, that "the government has adopted a regulation of speech because of disagreement with the message it convey[ed]" and therefore imposed a "content-based restriction." *See Ward*, 491 U.S. at 791.

MPD's alleged restriction of the protestors' speech can stand only if it can survive strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. *Reed*, 576 U.S. at 171 (quoting *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).    Defendants invoke "the Individual Defendants' substantial interest in controlling an incident or person to protect the lives of officers or the public." Defs.' Reply at 7.   And they cite the D.C. Circuit's observation that "the tenor of the demonstration as a whole . . . determines whether the police may

---

[3] Plaintiffs have not alleged viewpoint discrimination.

intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit." *See Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977). Yet for now, at least, Defendants' argument cannot succeed. At the motion to dismiss stage the Court "must accept as true all of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94, and Plaintiffs have alleged that all four protests were entirely peaceful. *See, e.g.,* Amend. Compl. ¶ 4. A police tactic cannot be narrowly tailored to further an interest in controlling a situation to protect the lives of officers or the public, when the subject of that force was an entirely peaceful protest.

The Plaintiffs have made out a First Amendment claim for abridgment of their speech by alleging that the officers' use of less lethal munitions against peaceful protestors was a content-based restriction on speech in a traditional public forum that cannot withstand strict scrutiny. Again, Defendants have not raised a qualified immunity defense so the Court will not consider qualified immunity at this time.

### 2. Plaintiffs Fail to State a Claim for Unlawful Seizure and Excessive Force in Violation of the Fourth Amendment

The Plaintiffs have failed to allege that the Individual Defendants possessed a prerequisite for a seizure, and thus excessive force: the intent to restrain. For that reason, they have not alleged a violation of the Fourth Amendment. And even if Plaintiffs have alleged a violation, they have failed to allege a violation of a *clearly established* right, meaning the Individual Defendants would be entitled to qualified immunity.[4]

---

[4] The Court is mindful of the Supreme Court's warning that "courts should think hard, and then think hard again, before turning small cases into large ones" by reaching the merits of a claim that must at any rate be dismissed on the basis of qualified immunity. *See Camreta v. Greene*, 563 U.S. 692, 707 (2011). However, the Court will reach the merits of the Fourth Amendment claims because doing so is necessary to resolve Plaintiffs' municipal liability claims.

Plaintiffs argue that the Individual Defendants violated their Fourth Amendment rights because their use of less lethal munitions constituted an unreasonable seizure and excessive force. *See* Amend. Compl. ¶¶ 337, 343–44, 353, 359–60, 369, 376, 385, 391–92.  Defendants contend that the Plaintiffs have failed to plausibly allege a seizure or unreasonable force.  *See* MTD at 11–15.  Defendants also argue Plaintiffs cannot overcome qualified immunity because there was no violation of the Plaintiffs' *clearly established* Fourth Amendment rights.  *See id.* at 23.  Defendants have the better argument.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  To state a claim for an unreasonable seizure, a plaintiff "must show that (1) the challenged actions constitute a seizure, and (2) the seizure was unreasonable."  *See Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 191 (D.D.C. 2015).  A Fourth Amendment seizure occurs either (1) "when physical force is used to restrain movement" or (2) "when a person submits to an officer's show of authority."  *United States v. Veney*, 45 F.4th 403, 405 (D.C. Cir. 2022) (quoting *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014)).

Plaintiffs allege a seizure by physical force, not show of authority.  *See* Pls.' Opp'n at 17.  This sort of seizure "requires the use of force *with intent to restrain*."  *Torres v. Madrid*, 141 S. Ct. 989, 998 (2021).  The intent to restrain is indispensable: "force intentionally applied for some other purpose" is no seizure.  *Id.*  In considering whether an officer had an intent to restrain, a court does not examine "the subjective motivations of police officers" or the "subjective perceptions of the seized person."  *Id.* at 998–99.  "[T]he appropriate inquiry is" instead "whether the challenged conduct *objectively* manifests an intent to restrain."  *Id.* at 998.

16

Because Defendants have invoked qualified immunity, it is not enough for Plaintiffs to allege violation of the Fourth Amendment.  Government officials are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818); *see also Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (holding that official immunity doctrine applies in actions under 42 U.S.C. § 1983.  For an asserted right to have been clearly established, it must be "that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Black Lives Matter D.C.*, 544 F. Supp. 3d at 43 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).  In the Fourth Amendment context, the "'specificity' of the rule is 'especially important.'" *Wesby*, 538 U.S. at 64 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  One must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)).  Applying these principles, the Court concludes Plaintiffs have failed to allege a violation of a clearly established Fourth Amendment right.

### (i)  Plaintiffs Have Not Alleged a Violation of the Fourth Amendment

The fatal flaw in the Amended Complaint is its failure to allege that the Individual Defendants acted with the "intent to restrain" required by *Torres*.  On the facts alleged by Plaintiff, the conduct of the MPD officers does not "*objectively* manifest[] an intent to restrain." *Torres*, 141 S. Ct. at 998.  Plaintiffs state that one purpose for the officers' deployment of less lethal munitions "was to incapacitate those struck to facilitate custodial false arrest."  Amend. Compl. ¶ 316.  But Plaintiffs have failed to plausibly establish this purpose for two reasons.  First, the assertion that the officers sought to incapacitate protestors is simply not supported by the facts

alleged, and "the Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint." *Keith v. U.S. R.R. Ret. Bd.*, 284 F. Supp. 2d 31, 35 (D.D.C. 2003). Actually, Plaintiffs' facts suggest the opposite: if the officers really had this purpose, surely the use of less lethal munitions would have been followed by large-scale arrests of protestors. But Plaintiffs allege only two actual or attempted arrests after only one of the four incidents.[5]

Second, there is an "obvious alternative explanation," *see Iqbal*, 556 U.S. at 682, for the Defendants' conduct: that because of their animus toward the protestors, the officers sought to *disperse*, rather than restrain, the protestors. Indeed, Plaintiffs describe MPD as forcing protestors to leave particular areas, not remain there. *See, e.g.,* Amend. Compl. ¶¶ 133–34 (describing how the munitions led to Ms. Crowding fleeing from the area); *id.* ¶ 260 (describing how the munitions caused Ms. Crespo to be carried to a nearby van for medical attention); *id.* ¶ 330 (alleging that "MPD's actions forced protestors . . . to evacuate [BLM] Plaza"). Another obvious alternative explanation in the Amended Complaint is that "[a] purpose" of the officers' use of force was to "retaliate, chill the message, and deter further protests through infliction of pain." *See id.* ¶ 315. In light of these alternative explanations, Plaintiffs' factually unadorned assertion about the officer's purpose of restraining protestors does not establish a claim for unreasonable seizure.

Looking past Plaintiffs' conclusory allegation of an intent to restrain, neither of the two factually grounded purposes attributed to the police evidences an intent to restrain. Intent to retaliate is obviously different. The harder question is whether intent to *disperse* counts as intent to restrain. *Torres* considered "only force used to apprehend" and declined "to opine on matters

---

[5] Plaintiffs state that in the August 2020 incident an officer "ordered [Ms. Ferris] to get on the ground in an effort to arrest her," but "then became distracted and engaged in the forcible arrest of another." *See* Amend. Compl. ¶ 321. But even in this case, the Plaintiffs stop short of alleging the large-scale arrests one would expect to occur if officers deployed less lethal munitions into a crowd for the purpose of facilitating arrests. *See id.* ¶ 329 ("The police continued to advance north up 16th Street, seizing BLM Plaza block by block from racial justice protestors and intentionally shooting munitions at people indiscriminately, injuring *and/or* arresting people present.") (emphasis added).

not presented here—pepper spray, flash-bang grenades, lasers, and more." *Torres*, 141 S. Ct. at 998.  That decision therefore "did not address whether force used only to compel departure from an area constitutes a seizure." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1256 (8th Cir. 2023).  Before *Torres*, several circuits indicated that the Fourth Amendment does reach forceful dispersal.  *See Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005) ("Fourth Amendment jurisprudence suggests a person is seized . . . when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action."); *Nelson v. City of Davis*, 685 F.3d 867, 873, 877–78 (9th Cir. 2012) (finding a seizure when police officer shot plaintiff in the eye with a pepperball projectile as part of an effort to disperse a crowd).  Since *Torres*'s gloss that seizure requires intent to restrain, several courts have considered whether police have an intent to restrain when they use force to block or disperse but not apprehend an individual.

The only courts in this district to have considered the question have concluded that force used to block or redirect a person does not constitute a seizure under *Torres*.  In *Jones v. District of Columbia*, No. CV 21-836 (RC), 2021 WL 5206207 (D.D.C. Nov. 9, 2021) (Contreras, J.), Jones alleged that he was in a public place when police officers approached him and "began to harass, taunt, push, and spit at him, all unprovoked." *Id.* at *1.  One of the officers pushed Mr. Jones twice.  With the first push, he "caused Jones to stumble backwards and blocked him from proceeding along his preferred path;" with the second, he again sent Mr. Jones "backwards." *Id.* at *4.  But the Court applied *Torres* to find that no seizure had occurred, as "[t]hese facts might well indicate an objective intent to prevent Jones from entering the area behind [the defendant Officer] Coward or to send him back in the direction he came from, but an intent to keep out or to redirect is not an intent to 'restrain' or to 'apprehend.'" *Id.* (quoting *Torres*, 141 S. Ct. at 998).

Similarly, in *Black Lives Matter D.C.*, the court held that officers accused of unconstitutional seizures were entitled to qualified immunity because although they allegedly "attacked and improperly *dispersed* the protesters[,] they did not restrain them or attempt to seize them in place." *Black Lives Matter D.C.*, 544 F. Supp. 3d at 48.  As in this case, "quite the opposite was true—the officers attempted to cause the protestors and fleeing crowd to leave their location, rather than cause them to remain there." *Id.*  The Court concluded that this scenario was "in stark contrast" to the Supreme Court's holding in *Torres*. *Id.* at 48 (citing *Torres*, 141 S. Ct. at 1003).

This Court agrees with the other courts in this district that an intent to "keep out or to redirect," *Jones*, 2021 WL 5206207 at *4, is different from an intent to restrain.  One might argue that the police "restrain" people when they use force to limit their freedom of movement.  But distinguishing an intent to disperse from an intent to restrain gives effect to the *Torres* Court's understanding of the Fourth Amendment as historically focusing on *arrests*.  The Supreme Court explained that "[t]he 'seizure' of a 'person' plainly refers to an arrest" and this "linkage existed at the founding." *Torres*, 141 S. Ct. at 996.  Accordingly, the Supreme Court in *California v. Hodari D.*, 499 U.S. 621 (1991) "properly looked to the common law of arrest for 'historical understandings "of what was deemed an unreasonable search and seizure when the Fourth Amendment was adopted."'" *Id.* at 996 (quoting *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018)).  Indeed, *Hodari D.* declined to "to stretch the Fourth Amendment beyond its words and beyond the meaning of arrest." *Hodari D.*, 499 U.S. at 627.

To be sure, a seizure can occur without an arrest.  But keeping a person in place remains essential.  Thus in *Terry v. Ohio*, the Supreme Court recognized that "the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology." *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

But in the same breadth, the Court continued: "It must be recognized that whenever a police officer accosts an individual and *restrains his freedom to walk away*, he has 'seized' that person." *Id.* (emphasis added). These decisions indicate the Fourth Amendment's regulation of seizure by physical force addresses use of force to apprehend individuals, not disperse them.

In addition, in two recent cases the D.C. Circuit has suggested that "restrain" refers to confining a person rather than simply causing them to go someplace else. In *United States v. Mabry*, the Court stated that a defendant who had fled from police "was not physically restrained." 997 F.3d 1239, 1243 (D.C. Cir. 2021). And *United States v. Gamble*, the Court did not find a seizure in which "physical force is used to restrain movement" because "officers did not use physical force against Gamble before he fled." 77 F.4th 1041, 1044 (D.C. Cir. 2023) (quoting *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020)).

Taking Plaintiffs' facts as true, the circumstances objectively demonstrate officers intended to expel protestors from particular areas, not restrain them. Since Plaintiffs have failed to adequately allege that the Individual Defendants possessed an intent to restrain, they have failed to allege a Fourth Amendment seizure.

### (ii)  *Plaintiffs Have Not Alleged a Violation of a Clearly Established Right*

But even if Plaintiffs have adequately alleged a violation of the Fourth Amendment, their claims would still be dismissed for failure to overcome the Individual Defendants' qualified immunity. As discussed above, in *Black Lives Matter D.C.*, another court in this district considered a Fourth Amendment claim for unreasonable seizures arising out of MPD's response to police-related protests in the District in the summer of 2020. 544 F. Supp. 3d at 49. The court held that the officers were entitled to qualified immunity because "the plaintiffs have not pointed to a case clearly establishing that attempting to move members of a crowd (rather than keep them in a

location) can constitute a seizure." *Id.* at 48–49; *see also Dundon*, 85 F.4th at 1257 (holding that "it was not clearly established as of November 2016 that use of force to disperse the crowd was a seizure"). That conclusion is equally true in this case.

According to Plaintiffs, it is clearly established that "the use of force that furthers no governmental interest is unconstitutional" and that "use of force against non-violent and non-resisting persons is unconstitutional." Pls.' Opp'n at 39. However, such general pronouncements do not suffice when officers are accused of violating the Fourth Amendment in particular. *See Wesby*, 538 U.S. at 64 (noting that in the Fourth Amendment context, the "'specificity' of the rule is 'especially important'" (quoting *Mullenix*, 577 U.S. at 12)); *id.* (stating that one must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." (quoting *White*, 580 U.S. at 79)).

Plaintiffs also argue that cases have held "that use of less lethal projectile weapons to move or disperse crowds constitutes a seizure regardless of whether individuals are ultimately arrested." Pls.' Opp'n at 39. But the cases cited by Plaintiffs do not suffice to clearly establish that officers violate a person's Fourth Amendment rights by using less lethal munitions to disperse a crowd (or inflict pain) rather than to effect arrests. The D.C. Circuit has explained that to "assess the officers' claim of qualified immunity, 'we look to cases from the Supreme Court and this court' and, if neither provides an answer, 'to cases from other courts exhibiting a consensus view.'" *Fenwick v. Pudimott*, 778 F.3d 133, 138 (D.C. Cir. 2015) (quoting *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008)). Disagreement among lower court judges about the underlying right may be a reason to find qualified immunity. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 378–79 (2009) (citing disagreement among lower courts as a reason to

uphold a qualified immunity defense, while "not suggest[ing] that entitlement to qualified immunity is the guaranteed product of disuniform views of the law")).

But plaintiffs cannot cite any binding precedents from the Supreme Court or D.C. Circuit. Nor have they shown a consensus view among the lower courts.  What they offer instead is a smattering of out-of-circuit cases, many of which are irrelevant.  Some of the cases were decided after some or all the events in question,[6] and therefore do not speak to whether the law was clearly established "at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Some are inapposite because they also involved an allegation that defendant officers intended to apprehend or confine the plaintiffs. *See Ciminillo v. Streicher*, 434 F.3d 461, 463, 465–66 (6th Cir. 2006); *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003).  Others are distinguishable because they involved police herding protestors to a particular area, rather than dispersing them.  *See Coles v. City of Oakland*, No. C03-2961 TEH, 2005 WL 8177790, at *1 (N.D. Cal. Apr. 27, 2005); *Rauen v. City of Miami*, No. 06-21182-CIV, 2007 WL 686609, at *2 (S.D. Fla. Mar. 2, 2007); *Jennings v. City of Miami*, No. 07-23008-CIV, 2009 WL 413110, at *9 (S.D. Fla. Jan. 27, 2009).  That leaves just three cases.  *See Bennett,* 410 F.3d at 834 ("Fourth Amendment jurisprudence suggests a person is seized . . . when a reasonable person would not feel free to remain somewhere, by virtue of some official action."); *Nelson*, 685 F.3d at 873, 878 (finding a seizure when police officer shot plaintiff in the eye with a pepperball projectile as part of an effort to disperse a crowd); *Otero v. Wood*, 316 F.Supp.2d 612, 626 (S.D. Ohio 2004)

---

[6] *See Pearce v. City of Portland*, 2023 WL 315913 (D. Or. Jan. 18, 2023)); *Johnson v. City of San Jose*, 591 F. Supp. 3d 649 (N.D. Cal. 2022); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216 (S.D. Ohio 2021), *modified*, 2021 WL 3375834 (S.D. Ohio 2021); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066 (N.D. Cal. 2020); *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206 (W.D. Wash. 2020).

(finding excessive force when police fired a projective weapon into an unruly crowd and struck plaintiff).

However, other courts have seen things differently, holding that police officers' exclusion or expulsion of a person from an area, even through the use of force, is not a Fourth Amendment seizure.  *See Jones*, 2021 WL 5206207; *Edrei v. City of New York*, 254 F. Supp. 3d 565, 574 (S.D.N.Y. 2017) ("An officer's request to leave an area, even with use of force, is not a seizure unless 'accompanied by the use of sufficient force intentionally to restrain a person and gain control of his movements.'") (quoting *Salmon v. Blesser*, 802 F.3d 249, 255 (2d Cir. 2015)), *aff'd sub nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018); *Sheppard v. Berman*, 18 F.3d 147, 153 (2d Cir. 1994) (rejecting unlawful seizure claim when plaintiff was escorted out of a courthouse by court officers but was free to go anywhere else he wished); *see also Buck v. City of Albuquerque*, No. CV 04-1000 JP/DJS, 2007 WL 9734037, at *31 (D.N.M. Apr. 11, 2007) (declining to follow the "small body of authority from a number of district courts which suggests that the use of a chemical agent to exert control over a crowd constitutes a seizure within the meaning of the Fourth Amendment" because plaintiffs did not argue that the officers' use of tear gas caused them to feel they could not leave), *aff'd*, 291 F. App'x 122 (10th Cir. 2008), *and aff'd in part, appeal dismissed in part*, 549 F.3d 1269 (10th Cir. 2008).

In light of the conflicted, out-of-circuit authority, the Court finds that in the summer of 2020 it was not clearly established that police officers' expulsion of a person from an area, even through the use of force, was a Fourth Amendment seizure.  Finally, since the Plaintiffs' unreasonable seizure claims fail, their excessive force claims—which they have based on the Fourth Amendment rather than due process—fail as well.  *See Robinson v. D.C.*, 736 F. Supp. 2d 254, 259 (D.D.C. 2010) ("To establish a Fourth Amendment violation for excessive use of force

by a police officer, a plaintiff must demonstrate that first, he was seized, and second, that the use

of force applied in the seizure was unreasonable.") (citing *Graham v. Connor*, 490 U.S. 386, 397

(1989) and *Johnson v. District of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008)); *Cnty. of*

*Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (holding that an excessive force claim was not

"covered by" the Fourth Amendment because "[t]he Fourth Amendment covers only 'searches and

seizures,' neither of which took place here"). Therefore, the Plaintiffs' Fourth Amendment claims

against the Individual Defendants must be dismissed.

### 3. Plaintiffs Fail to State a Claim for a Deprivation of Procedural Due Process in Violation of the Fifth Amendment

Plaintiffs have not established their Fifth Amendment due process claim against the

Individual Defendants because due process does not require police to provide fair warning

whenever they use force. And even if such a right does exist, it certainly was not clearly

established at the time of the events in question.

Plaintiffs allege that MPD violated their Fifth Amendment right to due process "by failing

to give fair notice of conduct that is forbidden or required, and by failing to provide clear and

intelligible, non-vague directives" before deploying less lethal munitions. Amend. Compl. ¶ 96;

*see also id.* ¶ 76. They further allege that MPD's standard operating procedures did not require

issuing a warning or dispersal order before discharging less lethal munitions against peaceful

protestors. Pls.'s Opp'n at 24; *see also* Amend. Compl. ¶¶ 71–76. For the proposition that the due

process fair notice requirement is violated when the police use less lethal munitions without a

warning or clear dispersal order, Plaintiffs present two recent, out-of-circuit district court cases.

*See* Pls.'s Opp'n at 24; *see also Dayton v. City & Cnty. of Denver, Colorado*, 649 F. Supp. 3d

1124, 1138 (D. Colo. 2023) (holding that a protestor sufficiently pleaded a due process claim by

alleging Denver authorized police to fire less lethal munitions at peaceful protestors without first

issuing a warning or dispersal order); *Ahmad v. City of St. Louis, Missouri*, No. 4:17 CV 2455 CDP, 2017 WL 5478410, at *15 (E.D. Mo. Nov. 15, 2018) (holding that police may violate due process by issuing inadequate dispersal orders before deploying less lethal chemical agents).

Of course, there is a general due process principle of fair notice. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). But Plaintiffs' attempt to extend this general principle into a new context smacks up against controlling precedent. The Supreme Court has held that the police do not necessarily need to issue a warning even before using deadly force. *See Scott v. Harris*, 550 U.S. 372, 382–83 (2007). And the D.C. Circuit has rejected the idea that a dispersal order is a constitutional prerequisite for every group arrest. *See Carr v. District of Columbia*, 587 F.3d 401, 410 (D.C. Cir. 2009).

At any rate, any right to fair notice before police use of force is obviously not *clearly established*. Plaintiffs have failed to cite any cases of controlling authority. Nor have they cited "a robust 'consensus of cases of persuasive authority.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). They cite only *Dayton* and *Ahmad*. But *Dayton* is irrelevant, because it postdates the events in question in this case, and therefore could not have contributed to clearly establishing the law "*at the time of the officer's conduct*." *See Wesby*, 583 U.S. 63 (emphasis added). And *Ahmad*, as a single out-of-circuit district court case, is not nearly enough to clearly establish a right. *See Fenwick v*, 778 F.3d at 138 (explaining that to "assess the officers' claim of qualified immunity, 'we look to cases from the Supreme Court and this court' and, if neither provides an answer, 'to cases from other courts exhibiting a consensus view'" (quoting *Johnson*, 528 F.3d at 976). Here, the paucity of authority for Plaintiffs'

purported due process right means that any such right would not be clearly established, meaning the officers would be entitled to qualified immunity on this claim.  Because Plaintiffs have not adequately alleged the existence of a right, yet alone a clearly established right, they have failed to state a claim under the Fifth Amendment.

### B. Plaintiffs Have Adequately Alleged First Amendment Claims Against the District of Columbia (Counts 1, 4, 7, 10)

Plaintiffs have adequately pleaded municipal liability under Section 1983 for their First Amendment claims, but not their Fourth or Fifth Amendment claims.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality such as the District of Columbia may be liable for the conduct of its employees under 42 U.S.C. § 1983. *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1135–36 (D.C. Cir. 2023) (citing *Monell*, 436 U.S. at 692).  Qualified immunity, though potentially available to the employees, is unavailable to the employer municipality.  *Owen v. City of Indep., Mo.*, 445 U.S. 622, 638 (1980).  However, municipalities "cannot be held vicariously liable for their employees' actions."  *Frederick Douglass Found.*, 82 F.4th at 1148 (citing *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).  Instead, the violation must occur pursuant to official policy or custom.  *Id.* (citing *Monell*, 436 U.S. at 694).  A court considering a *Monell* claim "must conduct a two-step inquiry." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  "First, the court must determine whether the complaint states a claim for a predicate constitutional violation . . . . Second, if so, then the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation."  *Id.*

For the reasons discussed in reference to Plaintiffs' claims against the Individual Defendants, the Court concludes that Plaintiffs have stated claims for predicate violations of the First Amendment, but not the Fourth or Fifth Amendments.

The next question is whether Plaintiffs have alleged a municipal custom or policy.  A plaintiff may do so on the basis of any of four theories: (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Blue v. District of Columbia*, 811 F.3d 14, 19 (D.C. Cir. 2015) (quoting *Baker*, 326 F.3d at 1306).  Under each theory, a plaintiff must show causation: the municipality's action must be the "moving force" behind the rights violation, meaning "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  Plaintiffs argue that the District is liable for violating the First Amendment under all four theories.  *See* Amend. Compl. ¶¶ 334, 340, 350, 356, 366, 372, 382, 388.  But the Court need not consider every theory, because Plaintiffs have adequately pleaded municipal liability under at least the policy maker theory.

Under certain circumstances, a municipality may be "held liable for the single decision of a final policymaker."  *Blue*, 811 F.3d at 19.  Whether a particular person has final policymaking authority in the relevant area or issue is a question of state law to be determined by the Court.  *Thompson v. District of Columbia*, 832 F.3d 339, 348 (D.C. Cir. 2016) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  Once it is established that a person was a policy maker, municipal liability for his or her actions requires that the "official must have demonstrated

'deliberate indifference to the risk that a violation of a particular constitutional or statutory right [would] follow the decision.'"  *Blue*, 811 F.3d at 19 (quoting. *Brown*, 520 U.S. at 411).

Defendants do not dispute that then-Chief Newsham possessed "final policymaking authority," *Jett*, 491 U.S. at 737, concerning the MPD practices at issue in this case.  *See* MTD at 28.  But they argue that Plaintiffs have failed to allege that his actions as a policy maker caused the constitutional violations committed by MPD officers.  *See id*.  Defendants' argument is unpersuasive, however, because Plaintiffs repeatedly allege that then-Chief Newsham's actions were the "moving force," *Monell*, 436 U.S. at 694, behind the alleged First Amendment violations. Taking Plaintiffs' facts as true, then-Chief Newsham "effectuated a policy, practice, and custom whereby, upon allegation of unlawful conduct by individuals, an entire assemblage was deemed to lose all protections . . . and would be subject to use of less lethal projectile weapons and resulting pain and injury without warning, notice, or demand for dispersal."  Amend.  Compl. ¶ 79; *see also id*. ¶¶ 80–83.

Defendants contend that Plaintiffs failed to allege that then-Chief Newsham "specifically ordered and approved any specific action by the individual officers in the incidents at the issue." MTD at 28.  But that disregards well-pleaded allegations that he "supervised, ordered, directed, authorized, and/or caused the violations," Amend. Compl. ¶ 26, because "at each of the incidents herein [he] was in the command center or on the scene monitoring events and engaging in command supervision and directives," *id*. ¶ 104, and he "directed and/or authorized the use of less lethal projectile weapons and was responsible for the officers' response on the scene," *id*. ¶ 105.

Since then-Chief Newsham was allegedly responsible for an established MPD policy of using less lethal weapons against peaceful protestors without audible warnings or dispersal orders, *id*. ¶¶ 72–83, Plaintiffs have alleged his "acquiescence in a longstanding practice or custom which

constitutes the 'standard operating procedure' of the local governmental entity." *Jett*, 491 U.S. at 737 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485–87 (1986) (White, J., concurring)). And since then-Chief Newsham allegedly directed the use of less lethal munitions in each of the specific incidents, Plaintiffs have alleged his "decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur." *Jett*, 491 U.S. at 737.  Directing the use of less lethal munitions against entirely peaceful crowds of protestors, pursuant to MPD policy, is enough to show "deliberate indifference to the risk that a violation of" Plaintiffs' First Amendment rights would follow.  *See Blue*, 811 F.3d at 19 (quoting *Brown*, 520 U.S. at 411).

Indeed, another court in this district has already found municipal liability for MPD officers' use of force against protestors during the summer of 2020 based on then-Chief Newsham's actions as a policy maker.  In that case, the court rejected defendants' argument that no particular action by then-Chief Newsham caused specific constitutional violations by MPD officers because of the plaintiffs' well-pleaded allegations that he supervised and was responsible for MPD officer's use of force against protestors.  *See Goodwin*, 579 F. Supp. 3d at 170.  Plaintiffs have thus adequately pleaded municipal liability for their First Amendment claims.

### C.  Plaintiffs Have Not Adequately Alleged Negligence (Counts 3, 6, 9, 12)

Plaintiffs have failed to adequately plead claims for negligence because they have not offered facts to support a scenario in which MPD officers' actions were negligent, not intentional.

Plaintiffs assert that the Individual Defendants were negligent in their use of force, and that the District is liable under the doctrine of *respondeat superior*.  *See* Amend. Compl. ¶¶ 347–48, 363–64, 379–80, 395–96.  Under District law, the basic elements of negligence are "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach."  *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793

(D.C. 2011).   Negligence is a cause of action distinct from intentional torts such as assault and battery.  *See Holder v. District of Columbia*, 700 A.2d 738, 742 (D.C. 1997).

District law permits a plaintiff injured by a police officer to plead negligence and an intentional tort as alternative theories.  *See District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003) ("An individual who has been injured by a District police officer may sue under one or more common law theories of legal liability such as assault and battery or negligence, as [the plaintiff] did in the instant case.").  However, "if, in a case involving the intentional use of force by police officers, a negligence count is to be submitted to a jury, that negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care."  *Scales v. District of Columbia*, 973 A.2d 722, 731 (D.C. 2009) (quoting *Smith v. District of Columbia*, 882 A.2d 778, 792 (D.C. 2005)).

Here, Plaintiffs have pleaded both negligence and intentional constitutional torts under 42 U.S.C. § 1983.  But Plaintiffs have not adequately pleaded any factual scenario supporting a claim of negligence other than the allegedly excessive force itself.  For each count, plaintiffs allege that the officers engaged in conduct that was "intentional or negligent."  *See* Amend. Compl. ¶¶ 347, 363, 379, 395.  But the Plaintiffs' own facts tell another story.  Plaintiffs repeatedly allege that MPD officers used force to "intentionally retaliate against and inflict pain upon protestors" for assembling and expressing views critical of the police.  *See id.* ¶¶ 1, 47–48, 87; *see also id.* ¶ 145 ("The use of force against [Ms. Crowder] was intended to retaliate against, punish, silence, and deter her expressive activities."); *id.* ¶¶ 213, 312 (alleging the same concerning both incidents involving Ms. Ferris); *id.* ¶ 276 (alleging essentially the same concerning Ms. Crespo).  Plaintiffs

also repeatedly state that the MPD officers *intentionally* deployed less lethal munitions into the crowd. *See id.* ¶¶ 125, 210, 271, 313.

Unlike in the case cited by Plaintiffs, here Plaintiffs have not advanced "alternative versions of what occurred." *Moore v. District of Columbia*, 79 F. Supp. 3d 121, 147 (D.D.C. 2015). Plaintiffs' facts do not suggest that MPD officers used force in any way other than to intentionally harm protestors and suppress their freedom of speech. *See also Chinn*, 839 A.2d at 710 (observing that cases upholding both negligence and battery counts to a jury have each involved "alternate scenarios in at least one of which a distinct act of negligence, a misperception of fact, may have played a part in the decision to fire"). Although Plaintiffs argue that the officers' use of less lethal munitions was negligent because they "failed to provide announcements or warnings," "failed to distinguish between peaceful protestors and those they claim they had cause to subject to force," and "deployed munitions too close to peaceful protestors," Pls.' Opp'n at 41–42, everything in the "Facts" section of the Amended Complaint points to intentional conduct. Plaintiffs only explain these actions as negligent when reciting each cause of action. *See* Amend. Compl. ¶¶ 347, 363, 379, 395. At no point do Plaintiffs even allege that the officers owed a duty to the Plaintiffs or proximately caused injury to Plaintiffs by breaching that duty.

To assert that MPD officers acted negligently without offering any support is precisely the sort of "conclusory statement[]" that does not suffice to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678. Therefore, Plaintiffs' negligence claims must be dismissed.

**D.  Plaintiffs Have Adequately Alleged a Claim of Negligence Per Se For Violations of the District of Columbia's First Amendment Assemblies Act (Count 13)**

Plaintiffs have adequately pleaded a claim of negligence per se based on the Defendants' violation of the District of Columbia's First Amendment Assemblies Act (FAAA).  Defendants' arguments to the contrary are unpersuasive.

The FAAA "declares the policy of the District to be that 'persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways . . . of the District of Columbia, and to engage in First Amendment assembly near the object of their protest . . . subject to reasonable restrictions designed to protect public safety, persons, and property . . . ."  *Ochs v. District of Columbia*, 258 A.3d 169, 171 (D.C. 2021) (quoting D.C. Code § 5-331.03 (2020)).  The statute "generally directs [MPD] to recognize and implement that policy."  *Id.* (citing D.C. Code §§ 5-331.02(2), 5-331.04(a), 5-331.07(a) (2020)).

At the time of the events in question, the FAAA provided that "[i]f and when the MPD determines that a First Amendment assembly, or part thereof, should be dispersed, the MPD shall issue at least one clearly audible and understandable order to disperse using an amplification system or device, and shall provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal."  D.C. Code § 5-331.07(e)(1) (2020).  Absent imminent danger of personal injury or significant property damage, the MPD "shall issue multiple dispersal orders." *Id.* at § 5-331.07(e)(2).  The FAAA also limits the use of certain less lethal munitions, providing that "[c]hemical irritant shall not be used by officers to disperse a First Amendment assembly unless the assembly participants or others are committing acts of public disobedience endangering public safety and security."  *Id.* at § 5-331.16(b)(2).  Plaintiffs allege that the Individual Defendants violated the FAAA by failing to issue dispersal orders, Amend. Compl. ¶ 404, and using chemical

irritants on peaceful protestors, *see id.* ¶ 1, and that the District is liable on a theory of *respondeat superior*.

Under District law, violation of a statute may constitute negligence per se only if (1) "the statute is meant to promote safety," (2) "the plaintiff is a member of the class to be protected by the statute," and (3) "the defendant is a person upon whom the statute imposes specific duties." *Ginsberg v. Granados*, 963 A.2d 1134, 1140 (D.C. 2009) (quoting *McCracken v. Walls–Kaufman*, 717 A.2d 346, 354 (D.C.1998)).  A statute establishing a standard for a negligence per se claim "must not merely repeat the common law duty of reasonable care, but must set forth 'specific guidelines to govern behavior.'"  *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996) (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 558 (D.C. Cir. 1993)).  The parties dispute whether the FAAA is an appropriate foundation for a negligence per se claim in this case. Plaintiffs are correct that it is.

Defendants argue that violations of the FAAA cannot constitute negligence per se because whether the statute even applies depends on the discretion of police officers.  The FAAA applies only in the context of a "First Amendment assembly."  *See* D.C. Code § 5-331.07(e)(1)–(2) (requiring dispersal orders "[i]f and when the MPD determines that a *First Amendment assembly*, or part thereof, should be dispersed" (emphasis added)); § 5-331.16(b)(2) (limiting the use of chemical irritant "to disperse a *First Amendment assembly*" (emphasis added)).  The statute defines a First Amendment assembly as "a demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views."  § 5-331.02(1) (2020).  By contrast, a "riot" is "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons."  § 22-1322(a).

Defendants assert that the threshold determination for whether the FAAA applies is "a police officer's determination about whether a gathering" meets the definition of a First Amendment Assembly.  MTD at 21.  Accordingly, "[t]he definition of a FAAA does not create 'specific guidelines' and therefore provides officers with discretion; under such circumstances, negligence *per se* is not available."  Defs.' Reply at 18.  It is true that a requirement that grants the regulated person "considerable discretion" may fail to specifically outline standards and for that reason not establish a standard of care under a theory of negligence per se.  *See Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1040 (D.C. 2014)

However, there is a difference between a statute that provides officials with discretion and a statute that applies only when a debatable condition is present.  The FAAA provides an objective definition of a First Amendment assembly, rather than delegating authority to police to determine when one exists.  Plainly, the FAAA governs an officer's conduct whenever such an assembly *exists*, not just when the officer *determines* one exists.

Defendants are incorrect that the FAAA provides officers with discretion rather than setting forth specific guidelines.  To the contrary, under certain objective circumstances the FAAA "directs MPD to implement an unambiguous, nondiscretionary protocol."  *Goodwin*, 579 F. Supp. 3d at 176.  If there is a First Amendment assembly, the FAAA's requirements for dispersal orders apply once MPD decides on dispersal and the FAAA's restriction on the use of chemical irritant applies once MPD decides on deployment.  Violation of the FAAA can thus constitute negligence per se because the FAAA "sets forth specific guidelines to govern behavior," *Joy*, 999 F.2d at 558, and provides "specific directions that go beyond a mere admonition of reasonable care," *see Sibert-Dean v. Washington Metro. Area Transit Auth.*, 721 F.3d 699, 704 (D.C. Cir. 2013); *see also id.* ("The question is not whether the regulation deals with a specific set of circumstances, but what

sort of behavior it prescribes for the circumstances that it governs."); *cf. Jarrett v. Woodward Bros.*, 751 A.2d 972, 987 (D.C. 2000) (holding that plaintiffs stated a claim for negligence per se by alleging a tavernkeeper violated a statute by serving a visibly intoxicated patron).

Defendants are also incorrect to argue that the FAAA does not impose specific duties on MPD officers but instead only governs MPD itself.  There does not appear to be applicable case law.  But as Plaintiffs point out, Pls.' Opp'n at 45, Defendants' argument disregards the "Construction" section of the FAAA.  Under that section, provisions of the FAAA "are intended to protect persons who are exercising First Amendment rights in the District of Columbia, and the standards for police conduct set forth in this subchapter may be relied upon by such persons in *any* action alleging violations of statutory or common law rights."  D.C. Code § 5-331.17 (emphasis added).  The plain meaning of the text is that the FAAA's standards may be relied on in "*any* action," including actions against individual officers, not just against MPD itself.  *See Sharps v. United States*, 246 A.3d 1141, 1149 (D.C. 2021) ("We will give effect to the plain meaning of a statute when the language is unambiguous and does not produce an absurd result.").

The Court concludes, then, that the FAAA may provide a basis for a claim of negligence per se.  Plaintiffs have plausibly alleged violations of the FAAA's dispersal order and chemical irritant provisions.  *See* Amend. Compl. ¶ 404 ("Defendants failed to issue any warning or orders to disperse, let alone 'issue multiple dispersal orders' to Plaintiffs"); *id.* ¶ 1 (alleging that MPD "authorized indiscriminate use of 'less lethal' projectile weapons against peaceful protestors and bystanders").  Therefore Count 13 will not be dismissed.

## IV.    CONCLUSION

The Plaintiffs' Section 1983 claims against the Individual Defendants (Counts 2, 5, 8, 11) may proceed with respect to the alleged violations of the First Amendment, but not the Fourth or Fifth Amendments.  Similarly, their Section 1983 claims against the District of Columbia (Counts 1, 4, 7, 10) may proceed with respect to the First Amendment but not the Fourth or Fifth Amendments.  Plaintiffs' negligence claims (Counts 3, 6, 9, 12) must be dismissed but their negligence per se claim (Count 13) may proceed.  For the foregoing reasons, the Court will **GRANT** in part and **DENY** in part Defendant's Motion to Dismiss.

A separate Order consistent with this Memorandum Opinion shall issue.


Date: _____12/15/23_____                           _____
                                                    Royce C. Lamberth
                                                    United States District Judge